IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN BOURIEZ,               )
MONTANELLE BEHEER B.V.           )
                                 )
          Plaintiffs,            )
                                 )
          vs.                    )  Civil Action No. 02-2104
                                 )
                                 )  Judge Arthur J. Schwab/
                                 )  Magistrate Judge Sensenich
CARNEGIE MELLON UNIVERSITY,      )
                                 )  Re: Docs. #75, #76
          Defendant.             )
                                 )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is recommended that the Motion for Summary Judgment filed
by Plaintiffs as to Defendant's Amended Counterclaim Count I and
Count II be granted.[1]

### II.   REPORT

Plaintiffs Christian Bouriez and Montanelle Beheer B.V., a
company that he wholly owns, (collectively referred to
hereinafter as "Plaintiffs" or "Bouriez") commenced this action
on December 6, 2002.  This case arises from Plaintiffs'
$5,000,000 investment in Governors Technologies Corporation
("GTC") which was allegedly based on representations by Defendant

---

[1] If this Report and Recommendation is adopted, the only
remaining counterclaim will be Count III.

Carnegie Mellon University (referred to hereinafter as "Carnegie
Mellon" or "CMU") for the development of microwave enhanced
catalytic cracking technologies.  Plaintiffs' claims against
Defendant are asserted in the nature of fraud (Count I),
negligent misrepresentation (Count II), and unjust enrichment
(Count III).

After an arbitration order was successfully overturned on
appeal, Defendant filed its Answer with three counterclaims on
April 21, 2004. (Doc. #31.) CMU filed a Motion for Leave to File
Amended Counterclaim on October 20, 2004, which was granted on
November 19, 2004. (Docs. #50, #62.) Count I of CMU's Amended
Counterclaim alleges that CMU is a third party beneficiary to a
contract or in the alternative that Plaintiffs were unjustly
enriched, Count II alleges Plaintiffs' personal liability on the
contract and seeks to pierce the corporate veil or hold
Plaintiffs liable under the participation theory, and Count III
asserts a claim for ownership of Bouriez' shares in GTC if he is
awarded damages. (Doc. # 62, ex.1).

On December 6, 2004, Plaintiffs filed a Motion to Dismiss
Count II of the Amended Counterclaim, arguing that the decision
in the arbitration order appeal, <u>Bouriez v. Carnegie Mellon
Univ.</u>, 359 F.3d 292 (3d Cir. 2004), was the law of the case,
which precluded the claims made in Count II. (Doc. #66.)
Plaintiffs also argued that Defendant failed to state a claim
under the averments in Count II. The Motion to Dismiss was denied

2

as to the law of the case argument, and as to the argument that the complaint failed to state a claim, it was denied without prejudice to consideration in this report and recommendation on summary judgment, in which Count II is also challenged.(Doc #104.) This report and recommendation addresses Plaintiffs' Motion for Summary Judgment as to Counts I and II of the Amended Counterclaim. (Docs. #75, #76.)

Plaintiffs filed a Motion to Strike Filings in Opposition to Plaintiffs' Motion for Summary Judgment and a Brief in Support of the Motion on May 27, 2005. (Docs. #83, #84.) That motion was granted in part by an Order dated July 27, 2005. (Doc. #95.) After objections were filed and oral argument was heard on these objections, the Court slightly modified its order to allow the admissibility in part of two struck documents, numbered 11 in Defendant's Appendix and supplemental exhibit 41 in Defendant's supplemental appendix. (See Doc. #103.) The Amended Memorandum struck the statements made by Mr. Yates and Defendant's Appendix, Doc. #82 exhibits numbered 6, 8, 11 in part, 12, 15, 17, 19, 20, 23 in part, 24-30, 31, 39, 41, 44, 56, 57-61, 63, 66, and supplemental exhibit 41 in part, but denied the motion to strike as to exhibits 11, 23, supplemental exhibit 41 in part, and the expert report of Dr. Kingston.[2]

---

[2] See Defendant's Appendix at Doc. #82 and Amended Memorandum Order at Doc. #103.

3

A.    **Facts**[3]

The Carnegie Mellon Research Institute ("CMRI"), a department of Carnegie Mellon University ("CMU") that closed in June 2002, engaged in contract research through private and public funding for industry and government entities.[4] (See generally, Doc. #82 at ex. 47.)  The purpose of this research was to produce commercially viable technology that would economically benefit those who wholly or partially funded the research. (Id.)

In 1996, CMU entered into an agreement entitled "Research into and Development and Commercialization of Radio Frequency Application for Industrial Uses" (hereinafter "1996 Funding Agreement") which recognizes that Zeta Projects Limited ("ZPL") intended to fund research and that CMU would have the right of first refusal to perform work for and on behalf of ZPL. (Doc. #93 at ¶2; Doc. #78, ex. 2.)  In 1997, a Project Plan for Microwave Enhanced Catalytic Processing was entered into between ZPL and CMU (referred to herein as "the Project").  (Doc. #93 at ¶3.)  On

---

[3] In their Joint Statement, the parties were only able to identify eleven facts which were deemed "undisputed". (Doc. #93.) Therefore, in order to provide a factual background for the discussion of this motion, the majority of these facts are gleaned from CMU's Responsive Concise Statement (Doc. #81) in order to view the facts in the light most favorable to the non-moving party, unless otherwise noted. See FED.R.CIV.P. 56(c). In this summary, when the facts are meaningfully disputed, the Plaintiffs' Concise Statement of Material Facts (Doc. #81) will also be referenced.

[4] For clarity of discussion, the Court will hereinafter treat CMU and CMRI as the same entity.

July 17, 1997, ZPL assigned its rights under the 1996 Funding Agreement to Recovery Refining Technologies ("RRT").[5]  (Doc. #93 at ¶4.)  On September 11, 1997, CMU, ZPL and RRT entered into a Consent Agreement affirming the assignment. (Doc. #93 at ¶5.) Subsequently, RRT changed its name to Governors Refining Technologies, LLC. ("GRT"). (Doc. #93 at ¶4.) GRT is a partially owned subsidiary of Governors Technologies Corporation US ("GTC US") which is wholly owned by Governors Technology Corporation ("GTC").(See Doc. #108 at 20:13-21:21.)[6]

In 1999, CMU and Bouriez discussed the possibility of Bouriez becoming an investor in the Project. During that time, Bouriez alleges that CMU represented to him that it had obtained a "proof of concept" on the microwave-enhanced cracking technology and that based on this representation, he agreed to invest $5,000,000 in GTC. (See Doc. # 77 at ¶¶6-8.) On October 5, 1999, Bouriez entered into a Share Purchase Agreement with GTC, the terms of which made Bouriez a shareholder and created two seats on the board of GTC for Bouriez' personal appointment in

---

[5] The 1996 Funding Agreement was the contract that CMU claimed was breached when it did not receive payment for work on the project. (See Doc. #78 at ex 28.) The 1996 Funding Agreement established CMU's right to payment from ZPL. (Doc. #78, ex 2 at 13.) On September 11, 1997, RRT, which became GRT, assumed the 1996 Funding Agreement. (Doc. #93 at ¶4.)

[6] For clarity of discussion, GTC US and GTC will be discussed generally as one corporation. However, it is important to note that these are two independent entities.

return for his five million dollar investment.[7] (See Docs. #81 at
¶47, #78 at ex. 10).  According to Bouriez and pursuant to the
Share Purchase Agreement, Bouriez elected himself to one of his
seats on the board. (Doc. #77 at ¶13.) CMU and Bouriez agree that
CMU was never a party to the Share Purchase Agreement. (Docs.
#77, 81 at 10.)

CMU continued working on the Project, and on August 14,
2000, CMU asserts that it received its last payment by GTC. (See
Doc. #81 at ¶51.) CMU admits that it was paid for work performed
through July 31, 2000. (See Id.) Bouriez alleges that at a GTC
board meeting on September 19, 2000, he was informed that some of
GTC's funds had been transferred to a parent company of GTC,
Governors Land Corporation ("GLC") by some members of GTC's board
without the whole board's authorization.[8] (Docs. #77 at ¶¶16, 17;
#81 at ¶52.)  After this discovery, CMU was notified of the
'wrongful' transfer and Bouriez resigned from the board of GTC on
October 6, 2000. (Doc. #81 at ¶ 18, 55.)  On December 5, 2000, it
is undisputed that CMU unilaterally stopped work on the Project
due to overdue invoices and notified GTC that it was no longer

---

[7] CMU asserts in Count I of its Amended Counterclaim that it
was the intended beneficiary of this agreement. (See Doc. 62, ex.
1.)

[8] There are no allegations that Bouriez was involved with
this 'wrongful' transfer to GLC.

working on the Project because of GRT's failure to pay.[9] (Docs. #81 at ¶25; #78, ex. 22.) On December 19, 2000, CMU invoiced GTC for $1,021,135 for work performed on the Project thru October 31, 2000. (Doc. #81 at ¶ 27.) CMU now claims that a total of $1,232,738 is outstanding for work performed.[10]

Bouriez was approached by CMU for additional funding and that he claims he was unwilling to invest additional funds or find additional investors until the Project underwent an audit. (Doc. #1 at ¶37). Plaintiffs allege that the audit revealed that Carnegie Mellon never had obtained a Proof of Concept on the Project technology.  (Id. at 38, 39).

Bouriez filed this action based on CMU's failure to obtain a proof of concept, and misrepresentations made to him relating to a proof of concept. None of Bouriez' claims are at issue in this summary judgment motion.

Defendant's Counterclaim alleges that Bouriez made promises to personally pay for research, and that he had obtained personal control over GTC to the extent that he personally blocked

---

[9] CMU stated that it terminated work on the project because Recovery Refining Technologies, LLC (RRT) had failed to pay for work performed since the end of July. (See CMU Ltr dated December 5, 2000 at Doc. #78, ex. 22.) However, the parties agree that RRT had changed its name to GRT. (Doc. #95 at ¶4.) Thus, CMU is asserting that GRT had failed to pay.

[10] This additional amount presumably reflects the additional costs for work performed from November 1 thru December 4, 2000 which was not included in the December 19 invoice. (See Amended Counterclaim at Doc. #62, ex. 1).

payments from GTC to CMU. (Doc. #62, ex 1). CMU claims that it is
owed $1,232,738 for work performed on the project. (Id.)  It
claims that Plaintiffs are personally liable for this debt under
theories of unjust enrichment or because it is the third party
beneficiary to the Share Purchase Agreement. (Id.) Further, CMU
seeks to recover from Bouriez personally by piercing the
corporate veil, or by prevailing on the participation theory by
showing that he personally participated in the corporation's
tortious conduct. (Id.) This case involves a complex set of
relationships. The following chart is provided only as an aid to
the remaining discussion of the relevant parties:

| | | | |
|---|---|---|---|
| *Transfer*: GLC, Governors Land Corporation, was the recipient of 1.3 million dollars from GTC funds. Bouriez alleges that the transfer of sums from the Bouriez investment was not authorized by GTC's board. | | **GLC**<br><br>Owns 3 million shares in<br>\|<br>\|<br>∨ | *Assignment:* ZPL was the original contracting party with CMU in K#2. ZPL assigned its rights and obligations under the contract to RRT, which later changed its name to GRT. The validity of this assignment is not challenged, and ZPL and RRT are not material parties to this case. |
| **Bouriez & Montanelle Beheer B.V.** (Plaintiffs) | <- *K #1* -> ("Share Purchase Agreement") | **GTC**<br><br>Wholly Owns | |
| *Contract #1*: Bouriez purchased 23% of the outstanding stock and two board positions in GTC for 5 million dollars | | **GTC US**<br><br>which owns 58% of the shares in<br>\|<br>∨ | *Contract #2:* GRT agrees to fund CMU's research in "the project" in return for property interests in the project. |
| *3rd Party Beneficiary Claim*: CMU alleges that it was the intended beneficiary of the investment made by Bouriez in Contract #1 | | **GRT** | <-- *K #2*--> ("1996 Funding Agreement")   **CMRI/CMU** (Defendant) |

**B.**   **Standard for Motion for Summary Judgment**

Summary judgment is appropriate if, resolving all inferences and doubts in favor of the non-movant, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986). Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**C.**   **Discussion**

Plaintiffs' Motion for Summary Judgment addresses two of the three counterclaims raised by the Defendant.  Count I asserts that CMU was a third party beneficiary of the contract between Bouriez and GTC or that in the alternative, he was unjustly enriched as a shareholder of GTC.  Count II offers two alternative theories for imposing liability on Bouriez as a shareholder of GTC, either by piecing the corporate veil or under the participation theory.  Count III is not challenged in the summary judgment motion.[11]

As a general matter, the Court is mystified regarding the nature of the relationships between the parties. CMU argues direct rights and liabilities between the parties of this case, primarily by ignoring that two separate contracts linked through three separate companies provide the only potential relationship between the parties which was disclosed to the Court.

Plaintiffs' complaint centers around negotiations and representations which were made between the parties before the investment (Share Purchase Agreement) was made. However, CMU's

---

[11] In its counterclaim, CMU fails to caption its counts to clearly identify which claims it is asserting in each count. Count I has been primarily addressed as an unjust enrichment claim by both parties, but a review of the Amended Counterclaim reveals that the unjust enrichment claim is actually plead as an alternative to the primary claim of intended third party beneficiary to a contract. (Doc. #62, ex. 1.) For consistency, each claim will be addressed in the order in which it was asserted in the Amended Counterclaim, and not in the order in which the claims were challenged in the Motion for Summary Judgment.

counterclaims are based on what transpired after the Share
Purchase Agreement was finalized. Specifically, CMU's claims
center around the relationships between the parties involved.
Neither party explains why the investment scheme caused funds to
be filtered through two companies before CMU, the company with
the contractual rights and obligations under the 1996 Funding
Agreement, received them. Clearly Bouriez' 23% ownership of GTC
stock would be further diluted by other GTC and GRT shareholders,
since GTC owned only 58% of GRT.

The investment relationships and contracts, which create no
direct rights between the parties to this case, were formed with
CMU's knowledge and seemingly at its direction. (See Burkett ltr
Doc. #78, ex 19). CMU claims that the Court should in equity
remove the corporate shields that insulate Bouriez from direct
liability to it. (Doc. #108 at 155-57.) CMU's rationale for its
counterclaim is that equity requires that the damages Bouriez is
seeking in his complaint, which are based on his investment in
GTC, must be offset by the amount that it did not receive from
GRT for its research. (Doc. #108 at 155-57.) To this end, CMU
raises several theories of recovery against Bouriez as an
individual. However, these claims overlook the requirement that
the person from whom the offset is sought must be shown to be
liable for that failure to pay. In short, CMU has failed to
establish a right to recovery against Bouriez under either
contract or tort.

11

**1.  Count I**

**a. CMU's Third Party Beneficiary Claim**

CMU claims that it is a third party beneficiary to the Share Purchase Agreement between Bouriez and GTC, pursuant to which Bouriez invested five million dollars in GTC in exchange for 23% of the stock in GTC.

Pennsylvania law provides that a party can only establish that it is a third-party beneficiary when a contract expressly so provides, unless:

> the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Scarpitti v. Weborg, 609 A.2d 147, 150- 51 (Pa. 1992) (citations omitted).

Plaintiffs challenge CMU's claim that it is a third party beneficiary of the contract between GTC and Bouriez on the ground that the Share Purchase Agreement does not reflect an intention of the parties to benefit CMU and CMU has not produced any evidence of that intention. (See Doc. #76.) Plaintiffs also assert the shared defenses rule, which requires that any claim that CMU could have as a third party beneficiary would be subject to the contract defenses Plaintiffs would have against GTC. Therefore, Plaintiffs allege that under the shared defense rule, CMU's failure to produce any evidence that Bouriez breached the

12

contract is fatal to CMU's claim.

CMU replies that an exception to the shared defenses rule applies in this case because either the terms of the contract or the surrounding circumstances reveal that the parties did not intend for it to be subject to contract defenses.[12] Bouriez notes that CMU has not cited any evidence to support its claim that either the terms of the contract or the surrounding circumstances prevent application of the general rule. Further, he notes that this exception has not been adopted in Pennsylvania. Finally, he notes that CMU has not produced any evidence that he expressed an intention to pay it for its research expenses if GRT and GTC failed to pay.

### i. **Spires** Test

CMU does not cite any evidence in support of its claim that it was intended to be a third party beneficiary of the contract between Plaintiffs and GTC. For example, CMU asserts that "GTC/GRT ("Governors") had a contractual obligation (with Bouriez's funds) to pay CMU for its work." (Doc. #89 at 20). However, CMU has not cited any evidence to support this assertion. CMU does not identify any evidence that GTC had an express contract with it. As previously noted, CMU contracted

---

[12] CMU's Brief in Opposition to Motion for Summary Judgment was originally filed at docket number 80, but pursuant to a June 22, 2005 Order of Court (Doc. #88), CMU filed an Amended Brief in Opposition to the Motion for Summary Judgment at docket number 89. Only the Amended Brief was considered by the Court in issuing this Report and Recommendation.

with GRT for the project, not GTC. Bouriez later purchased shares
of GTC as an investment in the Project, but he did not invest in
GRT. The only alleged relationship between Bouriez' funds and CMU
is through these two independent contracts and the relationship
between three companies.  Bouriez claims to have made this
investment at CMU's urging, undisputedly with CMU's knowledge.
CMU has identified no evidence that at the time of the Share
Purchase Agreement Bouriez was bound to direct to it the funds he
invested in GTC. CMU has not identified any provision in the
Share Purchase Agreement which provides a basis for finding that
it was intended to be a beneficiary of that contract.  Therefore,
the Spires test, which gives a third party beneficiary standing
if the contracting parties' intent to benefit such party is
expressly contained within the contract, is not satisfied.  See
Spires v. Hanover Fire Insurance Co., 70 A.2d 828 (Pa. 1950)
(overruled to the extent "that it states the exclusive test for
third party beneficiaries" by Guy v. Liederbach, 459 A.2d 744
(Pa. 1983)). Thus, CMU must rely on the alternative test adopted
in Guy to establish that it has standing to assert a claim as an
intended third party beneficiary. See Guy, 459 A.2d at 751.

**ii. Guy Test**

To establish a third party beneficiary claim under the
Restatement (Second) approach adopted in Guy, a party must
satisfy a two part test. See Id. and Golden v. Cook, 293

14

F.Supp.2d 546 (W.D.Pa. 2003). The first part of the test is
whether the court's "recognition of the beneficiary's right
[would] be appropriate to effectuate the intention of the
parties" and the second part is whether the performance of the
contract would "satisfy an obligation of the promisee to pay
money to the beneficiary; or the circumstances indicate that the
promisee intends to give the beneficiary the benefit of the
promised performance." See Guy, 459 A.2d at 751.  The Guy Court
explained:

> The first part of the test sets forth a standing
> requirement. For any suit to be brought, the right to
> performance must be appropriate to effectuate the
> intentions of the parties. This general condition
> restricts the application of the second part of the
> test, which defines the intended beneficiary as either
> a creditor beneficiary or a donee beneficiary, though
> these terms are not themselves used ... all
> beneficiaries who are not intentional beneficiaries are
> incidental beneficiaries. The standing requirement
> leaves discretion with the trial court to determine
> whether recognition of third party beneficiary status
> would be appropriate. If the two steps of the test are
> met, the beneficiary is an intended beneficiary unless
> otherwise agreed between promisor and promisee.

Guy, 459 A.2d at 751. Further, in order for a party to achieve
standing as a third party beneficiary under the Restatement
(Second) approach, the facts must be compelling. Scarpitti v.
Weborg, 609 A.2d 147, 150 (Pa. 1992). Even if the court
determines that standing is appropriate, the beneficiary is
subject to the same limitations which can be asserted between the
parties to the contract, that means that the beneficiary must

15

show a breach of contract or a deviation in the standard of care. See <u>Guy</u>, 459 A.2d at 751, and <u>Dressel</u>, 632 A.2d at 908. Finally, whether a party has established third party beneficiary status is an issue of law, not a question of fact. <u>Scarpitti</u>, 609 A.2d at 150.

First, CMU has not established the first part of the <u>Guy</u> test, that "the recognition of the beneficiary's right" is appropriate to effectuate the intention of the parties". See <u>Guy</u>, 459 A.2d at 751. At this point is seems appropriate to discuss the specific facts of <u>Guy v. Liederbach</u>, 459 A.2d 744 (Pa. 1983) and <u>Scarpitti v. Weborg</u>, 609 A.2d 147, 150 (Pa. 1992) which were the basis for the Court's decision in each case. In both cases it is clear that recognition of the beneficiaries' right was appropriate to effectuate the intention of the contracting parties. In <u>Guy</u>, the intention of the testator was to benefit his legatee, who was the plaintiff but was not a party to the will. In <u>Scarpitti</u>, the intention of the parties, an architect and the subdivision developer, in recording deed restrictions, was to benefit the purchasers of property in the subdivision. The plaintiffs were purchasers of property in the subdivision.

In this case, CMU has shown no more than that it had a right to be paid by GRT.[13] Recognition of a right on its part to

---

[13] The original contract between CMU and ZPL was assigned to RRT, which changed its name to GRT.

recover from Bouriez is not appropriate to effect the intention
of the parties. Bouriez' intention was to provide funding for the
Project in exchange for 23% of the shares of GTC.  (Docs. #1 at
¶¶32-33, #78, ex. 3.) The intention of GTC was to get funds for
the project in exchange for 23% of its shares. In order to
effectuate the intention of the parties it is not necessary to
recognize CMU as a beneficiary. Therefore, CMU has failed to
establish that it has standing as a third party beneficiary to
pursue contract remedies under the Bouriez/GTC Share Purchase
Agreement.[14]

Second, even assuming that step one was satisfied, CMU has
not produced any evidence that Bouriez had an obligation to pay
money to it or that the circumstances indicate that Bouriez
intended to give it "the benefit of the promised performance."
See Guy, 459 A.2d 751.

In 1996, three years before Bouriez entered into the Share
Purchase Agreement in 1999, CMU and ZPL entered into the Funding
Agreement pursuant to which ZPL was to fund research by CMRI
(CMU). (See Doc. 78, ex. 2 at 13 § 10). On September 11, 1997,
RRT, which became GRT, assumed that funding agreement. (Doc. #93
at ¶¶4,5.) Since the Funding Agreement was in effect in 1996,

---

[14] The Share Purchase Agreement contains a British Columbia
choice of law provision. However, neither party has raised the
laws of British Columbia as a basis for contractual
interpretation, nor cited the terms of the contract as a basis
for the third party beneficiary claim.(See Doc. #78 at exs. 10
and 11.)

Bouriez could assume that CMU would be paid by GRT pursuant to that agreement.[15] CMU has not identified any basis for its claim that when Bouriez entered into the Share Purchase Agreement, Bouriez intended to reimburse CMU for its research expenses. Although CMU states that it received its last payment from GTC on August 14, 2000, that was a year after Bouriez entered into the Share Purchase Agreement and cannot be considered a payment by Bouriez, who owned only 23% of GTC's stock.

CMU asserts, without citing any evidence, that its "performance of the work satisfied its contractual obligation thereby triggering the corresponding obligation of Governors/Bouriez to pay. Likewise, the circumstances indicate that Governors/Bouriez intended to give CMU the benefit, i.e. payment, of its promised performance." (Doc. #89 at 20.) The reference to "Governors/Bouriez" would seem to be intended to include GTC, GTC US, GRT, and Bouriez. But, they are four separate and distinct entities one of which is an individual, and they are not interchangeable.[16]  This distinction is important because under the second part of the test the question is whether performance of the contract would "satisfy an obligation of the

───────────────

[15] The contract was originally with ZPL, who assigned the contract to RRT, which changed its name to GRT.

[16] The treatment of all parties as one is only appropriate if CMU establishes that the corporate veil should be pierced. Defendants' theory will be discussed in the section captioned "Count II", infra.

18

promisee to pay money to the beneficiary; or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." See Guy, 459 A.2d at 751. CMU has identified no evidence that the performance of the Share Purchase Agreement would "satisfy an obligation of the promisee" (Bouriez) to pay money to it and, in fact at that time, as noted above, GRT had accepted the obligation to fund the research.[17] Finally, CMU has not identified any evidence that circumstances indicate that Bouriez intended to give it the benefit of the promised performance.

CMU's claim that "CMU's performance of the work satisfied its contractual obligation thereby triggering the corresponding obligation of Governors/Bouriez to pay" does not establish that Bouriez had an obligation to pay because Bouriez was not a party to CMU's contract and CMU was not a party to the Share Purchase Agreement. CMU has produced no other evidence of a promise by Bouriez to reimburse it for its expenses.  Further, CMU has not cited any circumstances that indicate Bouriez intended to give it the benefit of its promised performance. The relevant circumstance would appear to be that at the time of the Share Purchase Agreement, the predecessor of GRT was contractually obligated to reimburse CMU for its expenses. It again seems appropriate to compare the facts of this case with the facts in

---

[17] The original contract between CMU and ZPL was assigned to RRT, which changed its name to GRT.

Guy and Scarpetti. In Guy, the testator, in writing his will, had clearly intended to benefit the legatee, who was the plaintiff, and had hired the defendant attorney to carry out that intention. See Guy, 459 A.2d 744. In Scarpetti, the architect and the subdivision developer, in recording the deed restrictions, clearly had intended to benefit the purchasers in the subdivision. See Scarpitti, 609 A.2d 147.

Under the facts here, CMU would appear to be no more than an "incidental beneficiary"[18] under the Share Purchase Agreement, in that GTC, at some point in the future, might elect to use funds from Bouriez to satisfy a debt of GRT to CMU.

The strongest evidence the Court has been able to find that might support CMU's assertion that Bouriez intended to benefit CMU is contained in Plaintiffs' concise statement of Undisputed Material Facts, in which, after stating that Bouriez "invested $5 million in GTC in reliance upon the written and oral representations made by Carnegie Mellon about the microwave technology", it is stated "[t]his investment was made in order to fund the work being done by CMRI." (Doc. #77 at 8.) Defendant's Responsive Concise Statement denies the assertions of this paragraph. This statement might recognize CMU as an "incidental beneficiary" of the Share Purchase Agreement - if GTC chose to use funds from Bouriez' investment to reimburse CMU for its

---

[18] As defined in Guy, 459 A.2d at 751.

expenses, but it clearly does not establish an obligation or promise to pay CMU.

Even if Plaintiff's statement that its "investment was made in order to fund the work being done by CMRI" was sufficient to support a finding that it intended to benefit CMU,(which the court believes it is not) CMU would be still be precluded from being recognized as an intended beneficiary under both the <u>Spires</u> test and the <u>Guy</u> test because there is no evidence that, in entering into the Share Purchase Agreement, GTC intended to benefit CMU.

Under the <u>Spires</u> test, "[t]o be considered a third-party beneficiary in this state it is necessary to show both parties to the contract had an intent to benefit the third party through the contract and did, in fact, explicitly indicate this intent in the contract." <u>Strutz v. State Farm Mut. Ins. Co.</u>, 609 A.2d 569, 570 (Pa. Super. Ct. 1992) (citing <u>Spires v. Hanover Fire Ins. Co.</u>, 70 A.2d 828 (Pa. 1950) and referencing <u>Gerace v. Holmes Protection of Phila.</u>, 516 A.2d 354 (Pa. Super. Ct. 1986), *appeal denied,* 527 A.2d 541 (Pa. 1987). The intent of both contracting parties is also required under the <u>Guy</u> test, where third party beneficiary standing is only granted when it is "appropriate to effectuate the intention of the <u>parties</u>". See <u>Guy</u>, 459 A.2d at 751 (emphasis added).  Thus, CMU's failure to produce any evidence that GTC intended to benefit it when GTC entered into the Share Purchase Agreement precludes a finding that CMU is an

21

intended third party beneficiary.

CMU admits that the general rule is "that the promisor may assert against the beneficiary any defense that he could assert against the promisee" (CMU's Memorandum, Doc. 89, p. 20) but claims that this rule is "inapplicable where the language of the contract, or the circumstances under which it was executed" establish that the parties did not intend for the promisor to have such defenses." (Id. citing 13 Williston on Contracts § 37:55 (4th ed. 1990)). But rather than identifying any evidence that the parties, when they entered into the contract, did not intend for Bouriez to have any defense he could have against GTC, the promisee, such as a defense that he did not breach the Share Purchase Agreement, CMU cites, in footnote 24 on page 21, various items of evidence which do not address the intentions of Bouriez and GTC as set forth in the Share Purchase Agreement. Most of the cited events occurred after the Share Purchase Agreement was entered into.[19]

---

[19] The items of evidence cited in footnote 24 are: Bouriez invested in GTC 'in order to fund the work being done by CMRI'; Bouriez given control of determining the terms on which additional parties could invest in GTC; Bouriez personally paid Beekhuizen's salary; Beekhuizen was installed as President of GTC; Bouriez had reached an agreement that he was 'taking control of the company; 'The use of funds for the specific purposes was controlled by Bouriez and Blucher; Letter from Grayson to Bouriez with the detailed breakdown of GTC's accounts payable including 'Payment on CMRI account.' See also, supra, the Introduction and Background sections of this Amended Memorandum for a more detailed treatment of Bouriez's

Finally, CMU alleges, referring to Bouriez, that "[h]e offered to pay $5 million for the research and that offer was accepted particularly by CMU through performance." (See Doc. #89 at 20.)  CMU does not cite any evidence to support this claim, nor any evidence that Bouriez offered to pay it five million dollars for work on the project, or that it accepted such an offer by its performance. That would be a contract between CMU and Bouriez. No written or oral contract between these parties has been even remotely suggested beyond this single sentence which is not supported by any reference to the record.

Therefore, CMU has not established that it was a third party beneficiary to the Share Purchase Agreement nor has it provided any evidence that Bouriez breached an agreement or a duty owed to it under the Share Purchase Agreement.  Therefore, it is recommended that Plaintiffs' Motion for Summary Judgment should be granted as to the third party beneficiary claim contained in Count I.

### b. Unjust Enrichment Claim

CMU's counterclaim for unjust enrichment alleges that it is owed approximately $1,232,738 for work performed on the project. (Amended CC, Doc. #62, ex 1 at ¶ 36.) CMU contends that it has a

---

actions.
(Doc. #89, 21 at n. 24, internal citations and punctuation omitted).

right to payment from Bouriez[20] based on his investment and control of GTC.  (Id. at ¶¶ 37, 38.) CMU further claims that Bouriez has accepted and retained the results of Carnegie Mellon's work and it would be inequitable for him to retain it without payment for value. (Id. at ¶ 38.)

Plaintiffs argue that CMU has no basis for its unjust enrichment claim because no benefit was conferred upon them, there is no evidence of the value of the benefits, they were not enriched, and if there was any enrichment, it was not unjust. (Doc. #76.)

**1. Dichotomy presented by CMU's Unjust Enrichment Claim**

CMU has a contract with GRT for payment for work performed on the Project.  This unjust enrichment claim seeks to recover from a shareholder (Bouriez) in GRT's parent's (GTC US) parent (GTC) corporation. CMU is alleging that Bouriez, as a shareholder in GTC, has been unjustly enriched by CMU's performance under its contract with GRT because GRT failed to pay CMU for that work. CMU is not attempting to recover monies owed under the contract from the party that it contracted with, but is attempting to claim that a shareholder in another company has been unjustly enriched by GRT's failure to pay.

CMU has not cited any authority for holding a shareholder

---

[20] The reference to Bouriez is a collective reference to both Plaintiffs, Bouriez the individual, and his company Montanelle Beheer B.V.

liable for corporate debts, let alone the debts of a subsidiary corporation, premised only upon the showing that a shareholder was unjustly enriched by the corporation's failure to pay. Put another way, CMU seeks to impose liability on Bouriez because they are shareholders in a company that owns a company that partially owns a company that allegedly owes CMU money.

To the extent that the unjust enrichment claim is premised upon the success of Count II of CMU's Counterclaim which argues that Bouriez, the person, is individually liable under the alter ego theory of piercing the corporate veil, CMU's argument is contrary to the equitable doctrine of unjust enrichment.

In Pennsylvania, it is well established that "[u]njust enrichment is not applicable where the relationship among the parties is based on an express agreement." Birchwood Lakes Community Ass'n, Inc. v. Com, 442 A.2d 304 (Pa. Super. Ct. 1982), citing Third Nat. B. & T. v. Lehigh Val. Coal Co., 44 A.2d 571 (Pa. 1945), and Roman Mosaic & Tile Co. v. Vollrath, 313 A.2d 305 (Pa. Super. Ct. 1973). This rule would be applicable to defeat CMU's unjust enrichment claim if CMU were successful on its alter ego claim. For Bouriez to be personally liable for the debt of GRT under the alter ego theory, Bouriez would have to be the alter ego of GTC and Bouriez or GTC would have to be the alter ego of GRT. Thus, CMU would be foreclosed from arguing unjust enrichment because a contract exists between GRT and CMU

25

regarding the subject of the unjust enrichment claim.[21]

## 2. Assuming that Bouriez can otherwise be unjustly enriched as a individual

Unjust enrichment is a retroactive equitable remedy, where one party has wrongfully secured or passively received a benefit at the expense of another that would be unconscionable to retain. Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 477 (3d Cir. 2000), *citing* 16 Summary of Pa. Jur. 2d Commercial Law § 2.2); Mitchell v. Moore, 729 A.2d 1200, 1203-04 (Pa. Super. Ct. 1999).  To establish an unjust enrichment claim, CMU must demonstrate that: (1) it conferred benefits on Plaintiffs; (2) Plaintiffs enjoyed an appreciation of the benefits; and (3) it would be inequitable or unconscionable for Plaintiffs to accept and retain the benefits without payment of value.  Mitchell, 729 A.2d at 1204, accord Wiernik v. PHH U.S. Mortgage Corp., 736 A.2d 616, 622 (Pa. Super. Ct. 1999). If unjust enrichment is established, a contract is implied by law and payment for the benefit conferred is required. Schenck v. K.E. David, Ltd., 666 A.2d 327 (Pa. Super. Ct. 1995).

### A. Benefit Conferred

---

[21] No breach of contract claim has been alleged. CMU argues that the third party beneficiary claim (which is rejected, supra) arises from the Share Purchase Agreement, not the 1996 Funding Agreement which establishes the relationship between GRT and CMU.

Bouriez argues that no benefit was conferred on them because CMU claims that it owns the intellectual property and technology, as well as the documents that relate to such property; that it has the right to sell the property; and Plaintiffs are prevented from using the property for commercial advantage due to confidentiality agreements.[22] (See Doc. 89 at 14 n.19; Doc. #81 at ¶¶ 34-36; and Doc. #76 at 2.)

Carnegie Mellon argues that it has presented evidence to support its allegation that it conferred a benefit on Bouriez. This argument is threefold.  CMU argues that it worked on the Project, the Project increased in value due to its work, and Bouriez acquired rights to the Project through ownership of his 23% of the shares in GTC.  It is well documented that CMU worked on the Project and that Plaintiffs own shares in GTC.  CMU has presented evidence that the project has increased in value based on its work.[23]

However, unjust enrichment is a retroactive equitable remedy, and as such, CMU must establish that Plaintiffs benefitted or were enriched in the past. See Scaramuzza v. Sciolla, 2004 WL 2063062, *3 (E.D.Pa. Sept. 14, 2004)(unreported) citing D.A. Hill Co. v. Clevetrust Realty Investors, 573 A.2d

---

[22] Bouriez and his company do not claim to own the intellectual property and technology, and the parties have not identified any owner other than CMU.

[23] See analysis provided in the following subsection: "B. Enrichment Element, Value of Benefit"

1005, 1009 (Pa. 1990) and <u>Meehan v. Cheltenham Township</u>, 189 A.2d 593, 595 (Pa. 1963) ("must demonstrate that [the other party] has in fact <u>been benefitted</u>").

CMU claims ownership of the intellectual property and the technology resulting from its work on the Project. (Doc. 89 at 14 n.19.) It explains that its ownership results from a failure to fully fund the project. It does not specify which entities' or individual's failure to fund the Project resulted in its claim of ownership, nor does it identify who would be the owner if it had been paid.  CMU argues that it's claim of ownership is irrelevant in the unjust enrichment analysis, and tries to liken this ownership issue to a contractor who works on a home which is later foreclosed upon, or a mechanic who fixes a car which is later repossessed. However, CMU has not identified how these scenarios are relevant to the issues in this case. First, CMU is acting as both the party who performed the work and the party who repossessed or foreclosed upon the property. It is inapposite to argue that benefits have been conferred when the allegedly injured party retains the property it had improved.

Further, CMU has failed to establish that the allegedly 'benefitted' party, Bouriez, ever owned the property in the first instance. Plaintiffs deny that the intellectual property was ever transferred to or retained by them.  CMU answers with general conclusive statements, and does not cite facts to support its claim that concrete rights to the technology had been transferred

to Bouriez or GTC.  CMU claims to have presented evidence that Bouriez had already received valuable benefits because "Bouriez has arguable rights to the technology." (Doc. #89 at 14.) An "arguable right to the technology", which is not even asserted by Bouriez, is not a concrete or tangible benefit. This mere allegation of fact, which is unsupported by citation to the record, does not satisfy CMU's burden to show that a benefit was conferred upon Bouriez.

Therefore, CMU has failed to establish that Bouriez ever owned the intellectual property and technology or had concrete rights to an interest it, or that a benefit was conferred in connection with its work on the Project. Additionally, CMU cited no legal authority to support its assertion that a benefit can be conferred while ownership of the 'enhanced' property is retained by the party claiming unjust enrichment.

The ownership issue is relevant in this case because the party asserting unjust enrichment "cannot merely allege its own loss as the measure of recovery[,] i.e., the value of labor and materials expended[,] but instead must demonstrate that [the other party] has in fact been benefitted." Meehan v. Cheltenham Township, 189 A.2d 593, 595 (Pa. 1963).  Because CMU is claiming current ownership of the intellectual property, any remaining allegations against Bouriez merely assert the value of materials and labor it spent on development of the Project.

In this case, the ownership issue is the crux of the unjust

enrichment analysis because in order for CMU to have conferred the benefit of its unpaid research on Bouriez, it must have provided Bouriez with an interest in the intellectual property. Therefore, since it is not disputed that CMU claims "current" ownership of the property because it has not been paid for its work on it, there is no material issue of fact as to ownership of the property in the context of this motion.

Further, the alleged benefit that Bouriez could potentially receive in the future is irrelevant because to establish an unjust enrichment claim, it must be shown that the benefit has already been conferred. See Scaramuzza, 2004 WL 2063062 at *3. In order for CMU to confer a benefit on Bouriez as a shareholder under the facts of this case, the following events would have to occur:

1. CMU relinquishes property interests to GRT

2. GRT profits from the phase one technology

3. GRT passes this profit on to its shareholders, including US GCT its 58% owner,

4. US GCT passes its profits to GCT, its 100% owner, and

5. Bouriez sells his 23% of shares in GTC at a profit or receives dividends.

Thus, multiple events would have to occur in the future before Bouriez could benefit from the Project through his shares in GTC. Clearly, the degree to which Bouriez could benefit is unascertainable, but to constitute "unjust enrichment" it would

30

have to exceed his five million dollar investment. See <u>D.A. Hill</u> <u>Co. v. Clevetrust Realty Investors</u>, 573 A.2d at 1009-10.

CMU has produced no evidence that it conferred a benefit on Bouriez because it claims current ownership of the property. Bouriez has not received a benefit.  Additionally, any benefit that Bouriez could potentially obtain in the future is remote, and related only to his status as a shareholder. CMU has not cited any authority to base an unjust enrichment claim on an individual's potential receipt of future benefits.

**B. Enrichment Element, Value of Benefits**

The second element which CMU must show to establish an unjust enrichment claim is that Plaintiffs enjoyed an appreciation of the benefits which were conferred.  Assuming that a benefit was in fact conferred upon Bouriez, the issue is whether the value of the benefit conferred exceeds the value of the consideration he paid for the benefits. See <u>D.A. Hill Co.</u>, 573 A.2d at 1009. Plaintiffs argue that this element fails because CMU can not value the intellectual property.  CMU counters this argument with facts supporting a range of values that could be assigned to the intellectual property from five million to a billion dollars. CMU cites five items of evidence to

support its claim that the benefit has value.[24]

CMU cites Dr. Kingston's expert report as supporting a finding of value, as well as the deposition testimony of Dr. Guzman, CMU's designated representative, which provides a range of values from five million to one billion dollars.(Doc. #82 at 25-26).  Plaintiffs refer to the deposition testimony of Dr. Kingston in which he suggested he lacked expertise to make a value determination, and that Dr. Guzman's inconsistent statements of whether he could value the technology and argue that this testimony shows mere speculation as to value. (See Docs. #77, ex. 5 at 26:12-15; #94, ex. 32 at 218.)   The inconsistencies cited by Plaintiffs present credibility issues, which must be decided by the finder of fact.  Therefore, there is a genuine issue of material fact as to the value of the technology and whether the value exceeds Plaintiffs investment.


### C. Unjust Retention

The final element CMU must establish to prove its unjust enrichment claim is that restitution is proper because it would

_____

[24] One item cited is testimony of Sagilo which values the proof of concept from ten to twenty million. (Doc. # 82, ex. 3 at 85). However, there is an issue of fact as to whether CMU ever obtained a proof of concept. If Plaintiffs are correct that CMU never obtained a proof of concept, then the testimony of the value of the proof of concept  is irrelevant.  On the other hand, if CMU establishes that it did obtain a proof of concept, the testimony would be relevant to its value.

be unfair for Plaintiffs to retain the benefit that they have received. See Meehan, 189 A.2d at 596. "A necessary element of unjust enrichment is that a benefit must have been conferred for which no compensation was given. In other words, the enrichment to the owners must be unjust." Myers Plumbing and Heating Supply company v. West End Federal Savings and Loan Association, 498 A.2d 966, 969 (Pa. Super. Ct. 1985)(citation omitted).

CMU has not shown that Plaintiffs have received a benefit, and thus Plaintiffs do not have a benefit to retain. Assuming for the purposes of argument that all other elements of unjust enrichment have been established, CMU would be required to establish that the retention of a benefit by Bouriez would be unjust.

To support its claim that retention of a 'benefit' by Bouriez would be unjust, CMU alleges that "it would be unjust for Bouriez to retain rights to benefits of the technology where he personally blocked payment for that benefit." (Doc. #89 at 17.) CMU further contends that "Bouriez induced and mislead CMU into completing work when he did not intend to pay for it." ( Id. at 18.) Finally, CMU asserts that "Bouriez mislead CMU into believing that it would be paid and fabricated a reason to avoid payment." (Id.) CMU cites six exhibits for factual support for these allegations. In its Reply to the Amended Counterclaim, Plaintiffs note that none of CMU's cited authorities support this

33

assertion.   (Doc. #94 at 6). For the sake of argument, even considering the exhibits which have been struck, CMU has not cited evidence to support these assertions.

First, CMU cited the e-mail from Beekhuizen, President of GTC, to CMU that stated "[p]lease take this email as written authorization to proceed" as evidence to support its claim that Bouriez made personal assurances of payment. (See Doc. # 82 at ex. 11). CMU suggested that this statement coupled with Bouriez' admission that he probably paid Beekhuizen's salary (Doc. # 82, ex. 4 at 86:14-25) and the fact that Beekhuizen became the president of GTC (Doc. # 82, ex. 29) is enough evidence to support CMU's claim that Beekhuizen's statement binds Bouriez because Beekhuizen was acting as Bouriez' agent when the statement was made. CMU has not established that the statements made by Beekhuizen are attributable to Bouriez because CMU has not demonstrated that Beekhuizen was Bouriez' agent.[25] Therefore,

---

[25] It is well settled in Pennsylvania that a principal-agent relationship arises when, "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking" have been established. Etoll, Inc. v. Elias/Savion Adver., 811 A.2d 10, 21 (Pa. Super. Ct. 2002), citing Basile v. H&R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000).  There must also be an agreement to create a fiduciary relationship whereby the principal retains control over the agent, and the agent has the authority to bind the principal. See Basile, 761 A.2d at 1121.  The hallmark of the agency relationship lies in the agent's ability to legally impact the principal's relationships with third parties, resulting from the principal having manifested an intention that the agent act on his behalf. Id. In this case, not only has CMU failed to provide any legal authority to support its general claim that

exhibits 4, 11 and 29 do not support CMU's claim that Bouriez was actively involved in misleading it into continuing work or personally assured it that it would be paid.

The remaining communications proffered by CMU as evidence of its reliance on Bouriez' personal assurances of payment postdate any work it performed. It implemented a self-imposed work stoppage on December 4, 2000 (See Doc. 81 at ¶78) and these exhibits are dated various times in 2001. Therefore, these documents can not be a basis for reliance by CMU.[26]

----

Beekhuizen was acting as Bouriez' agent, the evidence cited to support the general agency claim, that Bouriez paid Beekhuizen's salary (Doc. # 82, ex. 4) and that Beekhuizen was "installed" as the President of GTC (Id. at Ex. 29) is glaringly insufficient to establish an agency relationship under the law of Pennsylvania.

[26] Specifically, in exhibit 21, an e-mail dated January 24, 2001, Bouriez stated that he intended to remain an active supporter of GTC and the project, noting that the strategy for the meeting must support both small and large shareholders, or he would not be involved. (Doc. # 82, ex. 21.) Further, this e-mail does not mention any payment, and refers to the presence of active shareholders of GTC, not just Bouriez. (Id.) In exhibit 42, dated April 11, 2001, a letter which he stated was written in his personal capacity, Bouriez expressed an intent to raise additional funds from other shareholders to provide CMU with payment. He also stated: "[i]n order to give you some assurances that sufficient funds will be available to carry out this research if it becomes necessary, I confirm to you that I would agree to put an amount of money in escrow sufficient to fund up to two months worth of additional research." (Id. ex 42 at 2.) This intent was conditioned on the success of the audit. This document does not support CMU's claim of reliance because it was dated after CMU stopped work on December 4, 2000 and because the assurance was expressly made conditional upon the success of the audit.(See Id. at 2). Finally, Supplemental Exhibit 58, an e-mail from Blutcher to Brassart and Bouriez, dated September 10, 2000, in reference to Beekhuizen's earlier e-mail explaining how to structure a "financial management program for GRT (GTC)", references "necessary payments to show we mean it" but contains

In sum, CMU has not produced any evidence to support its assertion that it relied upon personal promises of Bouriez to pay it for work on the project.[27]  Therefore, CMU has not established that Bouriez' retention of a benefit, if he had received any, would be unjust.


## 4. Conclusion

In sum, CMU's unjust enrichment argument fails because Bouriez is a shareholder protected from individual liability for corporate actions by the corporate shield doctrine, and even if the corporate veil could be pierced, CMU would be prevented from establishing a claim for unjust enrichment against Bouriez because of the express contract between CMU and GRT.  Assuming that the unjust enrichment claim can survive this dichotomy, CMU has failed to establish a prima facie case as to two elements of a claim for unjust enrichment.  Defendant has produced evidence that the project resulted in a benefit of value.  However, it has not produced evidence that a benefit was conferred upon Bouriez,

---

no promises to pay and there is no evidence that this internal GTC communication was received by CMU. (See Id. ex 58).

    [27] Only one of the six "supporting" documents was a communication between Bouriez and CMU, and this document was dated after CMU had stopped work on the Project. That letter contained only a promise of future action, conditioned on the happening of an event that did not actually result in further work by CMU, and does not support CMU's has not produced any evidence that Bouriez participated in any wrongdoing as a director, officer, or shareholder of GTC or as an individual.

or that the retention of a benefit by Bouriez would be unjust.
Because CMU has not produced evidence to support two of the three
elements of an unjust enrichment claim, it is recommended that
Plaintiffs' Motion for Summary Judgment be granted as to
Defendant's claim of unjust enrichment contained in Count I.

**c. Quantum Meruit**

CMU raises an alternative claim for damages in quantum
merit. (Id. at ¶ 39). It has been noted that:

> [a] cause of action in quasi-contract for quantum
> meruit, a form of restitution, is made out where one
> person has been unjustly enriched at the expense of
> another.  Therefore, a claim of quantum meruit raises
> the issue of whether a party has been unjustly
> enriched, and in order to prove such claim a party must
> successfully prove the elements of unjust enrichment.

Mitchell v. Moore, 729 A.2d 1200, 1202 n. 2 (Pa. Super. Ct.
1999)(citation omitted).  The above analysis of CMU's unjust
enrichment claim is adopted here. Defendant has not established a
claim for quantum meruit.  It should be noted that CMU stated in
its third party beneficiary claim that "classic contract law
counsels for the existence of an implied contract under these
facts." (Doc. #89 at 20). However, it did not elaborate on this
claim. Therefore, this argument will not be addressed beyond the
scope of the unjust enrichment or quantum meruit claims.

Accordingly, it is recommended that Plaintiff's Motion for

Summary Judgment as to Count I of Defendant's counterclaim be granted as to the quantum meruit claim.


### 2.   Count II

Count II of CMU's Amended Counterclaim raises alternative theories for imposing personal liability on Bouriez, the individual.[28]   CMU's first claim is that Bouriez is liable in his individual capacity for "failing to pay Carnegie Mellon for the amount due under the contract" with GRT under the alter ego theory of piercing the corporate veil. (Doc. 62, ex. 1 at 14 ¶51). CMU asserts that "Bouriez was the alter ego of GTC and is subject to personal liability on Carnegie Mellon's claim for breach of contract[29] through the application of the equitable doctrine of piercing the corporate veil." (Id. at ¶55.) In the alternative, Carnegie Mellon claims that Bouriez' personal

---

[28] Defendant never clearly articulates whether the allegations in Count II are directed only to Bouriez, the individual, or collectively to Bouriez and his company Montanelle Beheer B.V., and Defendant never asserts that Bouriez and Montanelle Beeheer, B.V. can be treated as one entity under a piercing the corporate veil analysis. Therefore, the analysis in Count II will only be directed to Bouriez the individual and references in this section to "Bouriez" do not include his company.

[29] CMU does not claim that it was ever a party to a contract with either Bouriez or GTC, it does not assert a breach of contract cause of action, nor provide the Court with the applicable law, facts and evidence necessary to establish a prima facie claim for a breach of contract. Thus, this reference to be a breach of contract will be disregarded.

conduct was tortious in connection to others at GTC, and therefore he is personally liable under the participation theory, even if the corporate shield can not be pierced. (Id. at ¶56.)

### a. Piercing the Corporate Veil under the Alter Ego Theory

In support of its claim which seeks to pierce the corporate veil, Defendant alleges that "GTC did not observe corporate formalities, was grossly under capitalized, and its officers eventually failed to actually function as officers." (Id. at ¶ 55.) Further, Defendant claims that Bouriez dominated GTC and took action in his personal capacity. (Id.) Thus, CMU asserts that Plaintiff was the alter ego of GTC and is therefore liable for its failure to pay CMU for its research costs. (Id.) CMU does not identify a factual basis for its claim that GTC had a legal obligation to pay it.

Plaintiffs note that there is no evidence to support CMU's claim that Bouriez was the alter ego of GTC. Specifically, Plaintiffs state that Defendant has failed to produce evidence of 'pervasive domination' of the business to the extent that the corporation, GTC, had no mind or will of its own. (Doc. #76 at 9.) Plaintiffs note that Bouriez was not involved in the incorporation of GTC, or the circumstances giving rise to the 1996 Funding Agreement between GRT and CMU. (Id. at 10-11.) Plaintiffs argue that they never had a controlling or majority

interest in GTC, and that Bouriez was given only very limited authority by GTC to represent it in negotiations. (Id. at 11-14.) Further, Plaintiffs argue that the "single entity" theory, pursuant to which CMU attempts to treat the various corporations as one, is not recognized in Pennsylvania and that GTC and GRT have separate and distinct corporate identities.

## 1. **Substantive Analysis of Piercing the Corporate Veil**

### a. **Pennsylvania Law**

In Pennsylvania, there is a strong presumption against piercing the corporate veil[30] based upon the general rule that the corporate entity should be upheld, unless specific or unusual circumstances require the application of the equitable doctrine of piercing. See S.T. Hudson Engineers, Inc. v. Camden Hotel Development Associates, 747 A.2d 931 (Pa. Super. Ct. 2000), and Lumax Industries, Inc. v. Aultman, 669 A.2d 893 (Pa. 1995).  The alter ego theory permits the corporate veil to be pierced if it is established that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." La Fata v. Raytheon Co., 223 F.Supp.2d 668 (E.D.Pa. 2002), quoting Culbreth v. Amosa (Pty) Ltd., 898 F.2d

---

[30] Accord Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC, 846 A.2d 1264, 1277 (Pa. Super. Ct. 2004).

13, 14 (3d Cir. 1990).[31] However, "[t]here appears to be no clear test or well settled rule in Pennsylvania... as to exactly when the corporate veil can be pierced and when it may not be pierced." Advanced Telephone Systems, 846 A.2d at 1278. In McKenna v. Art Pearl Works, Inc., the Pennsylvania Superior Court stated:

> We have said that the 'equitable doctrine of piercing the corporate veil (should be employed) to prevent the perpetration of wrong; to prevent its use as a shield for illegal and wrongful conduct; or where its use, as a technical device, brings about injustice or an inequitable situation so that justice and public policy demand it be ignored. However, we have not done so where the rights of innocent parties are involved and the corporation is used for a legal purpose, as otherwise the entire theory of the corporate entity would be made useless.'

310 A.2d 677, 679 (Pa. Super. Ct. 1973)(quoting Commonwealth v. Price Bar, Inc., 201 A.2d 221, 222 (Pa. Super. Ct. 1964)); see also Zubik v. Zubik, 384 F.2d 267 (3d Cir. 1967).

The factors to be evaluated to determine whether the corporate form should be disregarded are "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetuate a fraud." Advanced Telephone Systems, 846 A.2d at 1278.  In the context of creditors

_____

[31] In LaFata, the court held that the Plaintiff had produced no evidence that would justify piercing the corporate veil. See Id.

attempting to recover a corporate debt from an individual
shareholder, it has been said that:

> Factors to consider in determining whether the
> corporate veil can be pierced, include: (1) a failure
> to observe the corporate formalities; (2) non-payment
> of corporate dividends; (3) insolvency of the debtor
> corporation at time of a significant action or
> transaction; (4) siphoning of corporate funds by the
> dominant shareholder; (5) non-functioning of the other
> officers or directors of the corporation; (6) lack or
> absence of corporate records; (7) establishment that
> the corporation is merely a sham for the operations of
> the dominant stockholder(s); and (8)
> undercapitalization of the corporation.

In re RBGSC Inv. Corp., 242 B.R. 851, 859 (Bankr.E.D.Pa.
2000)(applying Pennsylvania law).

### b. Evidence Cited to Support CMU's Claim

As a preliminary matter, many of CMU's exhibits which were
submitted in support of its Response to Plaintiffs' Motion for
Summary Judgment were struck by Court Order granting Plaintiffs'
Motion to Strike on August 26, 2005. (Doc. #103).

It is noted that in order for Bouriez, a shareholder in GTC,
to be liable under GRT's contract with CMU, at least two separate
corporate shields must be pierced, if not three: GRT to GTC US to
GTC to Bouriez.

CMU's argument for piercing the corporate veil can be
summarized as follows: GTC was undercapitalized because Bouriez,
who controlled it, created a financial crisis by preventing
future investors from investing. (See Doc. # 89 at 23.) Further,

CMU cites the diversion of funds to GLC, Bouriez' use of personal
funds to pay debts, Bouriez right to appoint GRT board members,
and Blutcher's statement that GRT was "never was a company
functioning on their own" as evidence of a lack of corporate
formalities [32] (Id. at 44.) Additionally, CMU asserts that
"Bouriez represented that he was acting in his personal capacity"
(Id. at 26) and that GTC assumed GRT's contract with CMU. (Id. at
27.) CMU further argues that the fact that Bouriez was not
involved in the formation of the corporation is irrelevant and
that payment of expenses on behalf of GTC indicated his control.
(Id. at 25-27.) Each of these arguments will be addressed in
turn.

### i. Undercapitalization

CMU's argument that GTC was undercapitalized due to Bouriez'
control which created a financial crisis cited exhibits 4, 54, 55
and Plaintiffs' exhibits 7, 17 and 25. (See Doc. # 89 at 23.) The
following 'facts' are cited as evidence of Bouriez' involvement

---

[32] In the context of these arguments, made for the
application of the equitable doctrine of piercing the corporate
veil, CMU cites supporting documentation at Doc. # 82: Exhibits 3
at 249; 4 at 86, 149, 162-63, and 166; 6; 20 at bates 01335-36;
27-29; 39; 41 at bates 01821; 42 at bates 01449; 43 at 01268; 44;
50; 54; 55 at 2425; Doc. #91, supplemental exhibit 41 at bates
01820-21; and Plaintiffs' exhibits 7 at 1082; 17; and 25 at ¶7.
(See Doc. #89 at 21-27). Of these documents, exhibit 6, 20, 27-
29, 39, 41 and supplemental exhibit 41 in part were struck by
court order. (See Doc. #103.) Therefore, exhibits 3, 4, 42-44,
50,54, 55, supplemental exhibit 41 in part and Plaintiffs'
exhibits will be discussed in consideration of the argument the
exhibit was cited.

in GTC's undercapitalization: Bouriez knew that GTC was
undercapitalized when he invested, GTC owed CMU one million
dollars at that time, and 20 million dollars was needed to get
the Project to Prototype stage. CMU further argues that
notwithstanding this knowledge, Bouriez prevented additional
investors from investing and this resulted in a financial crisis.

To support its assertion that Bouriez is responsible for the
'financial crisis' in GTC, CMU cited minutes of a meeting on
October 13, 1999 at which the Board of Directors raised the share
price for a potential investment by the Republic of Nauru, based
upon Bouriez' "large infusion of funds [that] had increased the
value of the company and that should be reflected in any other
offer to the Nauru investment group." (Doc. # 82, ex. 55 at bates
02425-26). The meeting minutes reflected that "Everyone agreed
that the Nauru Trust would be a good partner but that the share
price should be higher." (Id. at bates 02426.) Therefore, the
meeting minutes simply do not support CMU's assrtion that
"Bouriez prevented additional investors from investing, thus
ensuring that such undercapitalization would continue and
ultimately cause a crisis at GTC." (Doc. # 89 at 23).

Additionally, CMU's assertion that Bouriez was "given the
power to dictate the terms of additional investors" is
contradicted by the minutes.(Id.) The minutes state that "GTC
would defer to Mr. Bouriez to formulate the direction regarding

the decision" and that a letter should be sent to Nauru explaining "that in light of the development progress over the last 18 months and with the involvement of [investment of 5 million dollars by] Mr. Bouriez, the share price terms would be higher." (Doc. 82, ex. 55 at bates 02425-26). The meeting minutes reveal that Bouriez merely participated actively in the discussion of terms for an investment in GTC by Nauru.

Moreover, the minutes of the meeting reveal that Bouriez' suggestion that the price per share be increased was agreed upon by the entire board. The minutes reflect:

> extensive discussion on whether we want to have the investment, do we want these people as investors, and if so what would we propose to them ... Mr. Bouriez asked if we needed the money, if the conditions were still valid and accurate [after 18 months of negotiations], and would they be the type of shareholders and investors that GTC would want.

(Id. at 02425.) The minutes reveal that Bouriez simply actively participated in the discussion of terms to be offered to Nauru for its potential investment. The minutes do not support CMU's claim that Bouriez unilaterally took over the board.

### ii. Lack of Corporate Formalities

CMU's assertion that GTC did not observe corporate formalities is supported by several general facts. First, CMU points to the diversion of funds from GTC to GLC by members of

45

GTC's board. This example of a lack of corporate formality was
supported only by citation to exhibit 20, which was struck.
Further, there is no claim that Bouriez was involved in this
diversion. (See Docs. #89, 103.) Next, CMU cites a statement by
Blutcher that GRT was never "a company functioning on their own"
to support its contention that there was a lack of corporate
formalities. This statement is contained in the portion of
supplemental exhibit 41 which was struck. (See Docs. #89 at 24,
#91, #103.) CMU further cites GTC's assumption of GRT's contract
as evidence of failure of corporate formalities.[33] However, this
"fact" is only supported by citations to the portions of
supplemental exhibit 41, and exhibit 6 which were struck.
Further, CMU fails to provide any legal basis for the claim that
GRT's contract was assumed by GTC, nor specific facts to
establish this claim. Therefore, these 'facts' will not be
considered because they are supported only by evidence which has
been struck.

CMU's remaining assertions in support of its claim that GTC
did not observe corporate formalities are: Bouriez' payment of
bills on behalf of GRT and Bouriez' contractual right to appoint
GRT board members. (Doc. # 89 at 24). These "facts" were
supported by citation to admissible portions of supplemental
exhibit 41, and exhibit 42. (See Doc. #103, #91, #89 at 23-24).

---

[33] (Doc. #89 at 24.)

46

Bouriez' ability to appoint GRT board members was supported by citation to exhibit 42. Exhibit 42 is a letter authored by Bouriez in 2001, addressed to CMU which explains that he had signed an agreement with GTC which would allow him to mutually appoint up to four board members of GRT. However, the terms of this agreement are not disclosed in the letter and there is simply no evidence that this agreement gave him control of GTC.

### iii. Officers and Directors not Functioning/ Personal Control

Bouriez' payment of bills on behalf of GTC and/or GRT is not evidence of his personal control of the corporation. His payment of corporate debts is not comparable to the cases in which a shareholder has taken money from a corporation for his personal use- a classic piercing situation. CMU has not cited any cases holding or even suggesting that the fact that a shareholder has paid a corporation's bills with personal funds is evidence of domination of the corporation for purposes of piercing the corporate veil. CMU argues that Bouriez' use of his own funds to pay invoices of GTC demonstrated his control of the company and cites admissible exhibits 3, 4, 43, 44 and supplemental exhibit 41. (Doc. #89 at 26-27.) Exhibit 3, 4 and 44 are cited to support the "facts" that Bouriez paid the salary of two GTC secretaries, lawyer fees, auditor fees, including Saglio, and the salary of

47

Beekhuizen, GTC's president. Further, exhibit 41 is cited to support the fact that Bouriez paid at least $125,000 in his own funds in an eight month period. Assuming that these facts are true, CMU has still failed to provide any legal basis for imposing liability on a shareholder for personally paying debts and salaries for a company by piercing the corporate veil. Payment of a corporation's debts with personal funds does not constitute pervasive domination of the corporation.

For the purpose of a thorough analysis, even assuming that all of the evidence cited by CMU was admissible and that all of its factual allegations are supported by the evidence, as discussed below, CMU has not shown that the corporate veil should be pierced to impose liability on Bouriez for the expenses of CMU's research.

### c. Piercing the Corporate Veil in Multiple Companies

The essence of CMU's claim is that the corporate debt of GRT to it for its research expenses is owed by GTC, either by assumption of the GRT/CMU contract or by piercing the corporate veil of GRT.  CMU then further contends that GRT's liability should be transferred to Bouriez as a shareholder in GTC.

CMU argues that the alter ego theory obligates Bouriez to pay GTC's debts, but it has not argued that the alter ego theory requires that GTC be held liable for the debts of GRT. It seems

48

to rely on the single entity theory to allow this level of
piercing. But this theory has not been adopted in Pennsylvania.[34]
CMU has also failed to discuss the impact that the existence of
GTC US has on the application of the alter ego theory in this
case. These failures prevent CMU from establishing a prima facie
case for piercing the corporate veil to hold Bouriez liable for
the debts of GRT.


### i. Piercing GRT's Corporate Veil to Reach GTC

In this case, the seemingly appropriate rule is that "a
party which knowingly limits its contractual relationship to one
of two or more related corporate enterprises cannot successfully
attack the validity of the entity with which it dealt without
proof of misrepresentation or other unusual circumstances

---

[34] See discussion of this theory in the following subsection
entitled "Piercing GRT's Corporate Veil to reach GTC" below.
Further, CMU made a blanket assertion that GTC had assumed GRT's
contract with CMU and cited exhibit 6, which was struck, as
support for this allegation. Even if it were not struck, exhibit
6 would not support a finding that the contract was assumed, as
discussed under the above referenced subsection. CMU later cites
supplemental exhibit 41 as support for this concept, when arguing
that the assumption of the contract is evidence of a failure to
follow corporate formalities.  However, supplemental exhibit 41,
does not support the contract assumption assertion made by CMU,
as discussed under the subsection of this section captioned
"Piercing GTC's Corporate Veil to Reach Bouriez". Further, beyond
these citations and the general assertion, CMU never provides the
applicable legal analysis, discussion, or facts necessary to
support a finding that GTC assumed GRT's contract. Finally, CMU
has not raised, briefed or discussed the legal requirements for
assumption of  a contract.

justifying the application of an estoppel." <u>Chengelis v. Cenco</u> <u>Instruments Corp.</u>, 386 F. Supp 862, 865 (W.D.Pa. 1975), citing <u>Brown v. Gloekner,</u> 118 A.2d 449, 451 (Pa. 1955). CMU knowingly directed Bouriez to contract with GTC, with which CMU had no direct contractual relationship. CMU does not claim that there was any fraud or misrepresentation regarding the Bouriez investment. It does not claim that it was an unknowing victim of the corporate structure of GRT and GTC, or the limitations imposed by the contractual relationships between the parties. CMU has not attempted to pierce the corporate veil under the alter ego theory between GRT and GTC.

Further, CMU has not established that it has a cause of action under the single entity theory, which allows multiple corporations to be treated as one when evidence suggests that the corporations are under common ownership and operate as one. Although CMU alleges that GCT and GRT should be treated as a single entity, the single entity theory of piercing the corporate veil has not been adopted in Pennsylvania. See <u>Advanced Telephone</u> <u>Systems, Inc. v. Com Net Professional Mobile Radio, LLC</u>, 846 A.2d 1264, 1278 n.9 (Pa. Super. Ct. 2004).

CMU cites <u>Ziegler v. Delaware County Daily Times</u>, in response to Plaintiffs' assertion that Pennsylvania does not recognize the single entity theory. See <u>Ziegler</u>, 128 F.Supp.2d 790 (E.D. Pa. 2001). However, <u>Ziegler</u> specifically states "[w]e

note that the Miners, Inc. Panel immediately noted that the single entity theory 'has yet to be adopted in Pennsylvania.' However, in light of the Marzano holding, which appeared to focus on *this type* of veil piercing, we will nevertheless consider these factors." Ziegler, 128 F.Supp.2d at 796 n.18 (citing Miners, Inc. V. Alpine Equipment Corporation, 722 A.2d 691 (Pa. Super. Ct. 1998) and Marzano v. Computer Science Corporation, 91 F.3d 497 (3d Cir. 1996)). CMU's citation is misleading for three reasons.  First, the holding in Miners post-dates the holding in Marzano. As such, reliance on Marzano, a federal case, to establish the controlling law of Pennsylvania over the  authority of a later Pennsylvania case is improper. Second, Marzano applies *New Jersey* law. As such, it is not relevant to the determination of Pennsylvania law in the case at issue. Finally, the Ziegler Court's analysis was clearly limited in scope, "on *this type* of veil piercing", to employment discrimination law. See Ziegler, 128 F.Supp.2d at 796 n.18. The Ziegler Court expressly noted that the Marzano Court analyzed the question of "whether a corporate parent and one of its subsidies can be treated as a single employer for *the purposes of employment discrimination law*.. as analogous to the question of piercing the corporate veil *in the particular circumstances of employment*... ." Ziegler, 128 F. Supp.2d at 795 (emphasis added).

CMU's statement that Pennsylvania has recognized two

theories is correct, but it is misleading because Pennsylvania
has not adopted both theories. CMU's claim that Bouriez can be
liable for GRT's contract based on the single entity theory is
without merit. GTC and GRT are separate and distinct
corporations, and the corporate veil remains in place unless it
is established that GTC was the alter ego of GRT, a claim that
CMU has not made.

Further, CMU's assertion that GTC assumed the contract of
GRT is contained in two sentences of CMU's brief. "...GTC assumed
(usurped) the contractual obligations of GRT. In fact, GTC
representatives directly informed CMU that the university's
'contractual obligation' was with GTC." (Doc. # 89 at 27, citing
Doc. #82 ex. 6.) Although, Exhibit 6 was struck as inadmissible
hearsay (Doc. #103), it was the only evidence cited as support
for this assertion that GTC assumed the GRT contract.[35]   In
addition, it does not support CMU's claim that GTC assumed the
contract of GRT. CMU's alternative theory for imposing liability
on GTC for a contract between GRT and CMU is unsupported.

Finally, CMU has not identified evidence which satisfies the
requirement under Pennsylvania law that:

> the party seeking to pierce the corporate veil on an
> alter-ego theory must establish that the controlling

---

[35] CMU also cites supplemental exhibit 41 in reference to
the piercing argument as evidence that GTC assumed the GRT
contract. (Doc #89 at 24.) The portion of supplemental exhibit 41
cited was struck. (See Docs. #103.)

corporation wholly ignored the separate status of the
controlled corporation and so dominated and controlled
its affairs that its separate existence was a mere
sham. Alternatively, it is necessary to show that the
controlled corporation acted robot-or puppet-like in
mechanical response to the controller's tugs on its
strings or pressure on its buttons.

Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 55
F.Supp.2d 337, 344-345 (E.D.Pa. 1999)(citations omitted).
Additionally, CMU has not identified any evidence to support
piercing the corporate veil of GRT, the subsidy, to reach GTC,
the 58% owner, under the alter ego theory.[36] Bouriez remains
insulated by the corporate veil of GTC, and GTC remains insulated
from GRT's presumed liability on its contract with CMU.


### ii. Piercing GTC's Corporate Veil to Reach Bouriez

If, contrary to the above analysis, GTC was not insulated
from liability for GRT's actions, CMU would still be required to
pierce the corporate veil of GTC in order to impose personal
liability on Bouriez, a shareholder in GTC. To support this level
of piercing, CMU asserts that Bouriez "through his personal
control and actions induced CMU to work after October 2000."
(Doc. #89 at 26(emphasis added)). It is undisputed that CMU

---

[36] It is worth repeating that CMU never addresses the
existence of GTC US, a wholly owned subsidy of GTC, which is
positioned between GRT and GTC.  No evidence was cited or
argument made to support piercing the corporate veil of GTC US to
reach GTC. Therefore, an additional level of corporate shield
insulates Bouriez from the alleged actions or inactions of GRT.

53

stopped work on the Project on December 4, 2000. (Doc. #81 at
25.) Therefore, CMU is alleging that Bouriez is personally liable
for work performed between October 2000 and December 4, 2000
under the alter ego theory. To support this allegation, CMU cites
conduct that occurred before October 2000[37] or after the self-
imposed work stoppage on December 4, 2000[38]. CMU has not cited a
single communication or action which occurred during the
'critical period' which would support CMU's assertion that
"Bouriez through his personal actions and control induced CMU to
work after October 2000 and CMU suffered damages as a result."
(Doc. #89 at 26).

   CMU makes much of the fact that Bouriez used his personal
funds to pay debts of GTC, and possibly of GRT. (Doc. #91, ex. 41

---

[37] For example, the following "facts" which CMU cites to
support its argument that Bouriez was the alter ego of GTC are
alleged to have occurred before October 2000: Bouriez knew that
GTC was undercapitalized when he invested in it (in 1999),
Bouriez prevented additional investors from investing, GTC was in
crisis by September 2000, funds were transferred to GLC without
the Board's knowledge, and Bouriez invested with GTC to fund
GRT's contract (1999). None of these "facts" would support the
application of the alter ego theory during the "critical period
after September 2000." (See Doc. # 89 at 25 n. 27 which argues
that CMU should not be estopped from claiming Bouriez was the
alter ego of GTC during this time although it argues that Cowhig
and Grayson "blurred the distinction between GRT and GTC during a
different time period.")

[38] The March 2001 agreement is discussed at length and cited
as evidence of Bouriez' power and control over GTC. However, CMU
is alleging that it relied upon promises made by Bouriez in
continuing to work after October, 2000.  The last day work was
performed was December 4, 2000.  CMU has not established how
Bouriez' activities in 2001 could have induced CMU's actions in
2000.

at bates 1820). However, Pennsylvania has distinguished a
shareholder's payment of debts on behalf of a corporation, from a
shareholder syphoning money from the corporate accounts for
personal use. See <u>Fort Washington Resources, Inc. v. Tannen</u>, 153
F.R.D. 565, 567-568 (E.D.P.A. 1994)(applying Pennsylvania law).
The former is not a basis for piercing the corporate veil, while
it  latter is one of the classic factors that does justify
piercing it.  <u>Id.</u> at 567. CMU seems to argue that because Bouriez
paid some debts of the corporation(s), he should be held
accountable to pay them all.

    CMU cites only five admissible exhibits to support its alter
ego claim.[39] The remaining exhibits it cites were struck by Court
order.[40] (See Doc. #103). Even if the cited evidence which was
struck had not be struck, it would not support CMU's argument.

    Exhibit 6 is an e-mail from Beekhuizen to David Purta which
was cited to support CMU's assertion that "GTC representatives
directly informed CMU that the university's 'contractual

_____

    [39] Exhibits 4, 42, 54, 55 and supplemental appendix 41.
(Docs. #82, 91.) Exhibit 4 is the deposition of Bouriez
(admitting that he probably paid Beekhuizen's salary), Exhibit 42
is a letter from Bouriez to Burkett dated April 11, 2001 (after
the period in question); Exhibit 54 is a GTC internal e-mail
about outside investors written on February 20, 2000(before the
period in question); Exhibit 55 is meeting minutes of GTC on
October 3, 1999 (before the reliance period); and supplemental
exhibit 41 (at Doc. #91, struck in part at Doc. #103) contains
GTC e-mails sent on June 24, 2002 (after the reliance period).

    [40] Exhibits 6, 20, 28, 29, 41, and 44 were struck.

obligation' was with GTC" and that GTC assumed GRT's contract. (See Doc. #89 at 27.) In exhibit 6, Beekhuizen was complaining that Purta had contacted Suncor, a company with which GTC was discussing a structured business process. Beekhuizen stated that "[i]f you have comments or queries on the matter bring them to GTC first. This is where your contractual obligation lies (not to Suncor)." (Doc. #82, ex. 6.) In context, this statement does not support Defendant's claim that GTC assumed the GRT contract.[41]

Exhibit 20 is a draft memo from an unknown author which states that Bouriez and Blutcher agreed to consider providing a "bridge loan" to GTC, secured by GTC shares. It was recommended that Bouriez, Beekhuizen, Blutcher and Cooke were to act as interim managers of GTC during a four month transition period. Simply stated, none of these facts provide a basis for piercing the corporate veil.

Exhibit 28 is an e-mail from Blutcher dated March 30, 2001 which postdates the reliance period, and states that Bouriez had given GTC an ultimatum for his conditions to be agreed on. This document does not support CMU's argument that Bouriez was in

---

[41] CMU again asserts that "GTC assumed GRT's contract" in connection with its claim that the companies did not observe corporate formalities, and cites supplemental exhibit 41, which is an e-mail sent June 24, 2002 (after the critical period). The e-mail notes that GTC paid some of GRT's debts, but also states that money paid by GTC was to be booked as a loan to GRT. (See Doc #91, supplemental exhibit #41.) Further, CMU provides no legal analysis in support of its argument that the contract was assumed.

control of GTC. If he was, an ultimatum would be unnecessary. Further, CMU makes assertions regarding the far reaching implications of basic facts. For example, exhibit 29, an e-mail from Beekhuizen dated February 10, 2000, states that effective that week he would become president of GTC. CMU argues that the fact that Bouriez paid Beekhuizen's salary is evidence that Bouriez gained operational control of GTC. But it does not identity any evidence that Beekhuizen was acting as Bouriez' agent. Exhibit 41, an e-mail to Bouriez, refers to GRT as never "functioning on their own" but also notes that GTC funds used to pay GRT should be booked as loans. Finally, Exhibit 44, another e-mail to Bouriez, suggests that Bouriez and GTC's management had fixed the scope of the work to be done by Saglio. CMU cites another e-mail contained within the e-mail to Bouriez, which contains the statement that Saglio's mission "was decided by [Bouriez]..." but the e-mail actually reads in whole that the scope of the mission "was decided and paid by [Bouriez] in accordance with GTC's management." (Doc. #82, ex. 44).  The clear meaning of "in accordance with GTC's management" contradicts CMU's assertion that Bouriez was exercising complete control of GTC.

Having evaluated all the documents cited by CMU, including the exhibits which were struck, only exhibit 41 which states that GRT was never "functioning on [its] own" provides any support for

CMU's alter ego claim. However, this e-mail was properly struck as hearsay and even if it could be considered, it would not establish that Bouriez pervasively dominated GRT and therefore was the alter ego of GRT.

It is recommended that Plaintiff's Motion for Summary Judgment be granted as to Count II as it relates to piercing the corporate veil because this Count is factually unsupported. The only remaining basis for recovery in Count II is the  alternative theory of liability alleged under the participation theory.


## b. Participation Theory

Pennsylvania recognizes individual liability under the 'participation theory'. See Wicks v. Milzoco Builders, Inc., 470 A.2d 86 (Pa. 1983); and Kaites v. Commonwealth of Pennsylvania, Dep't of Envtl. Resources, 529 A.2d 1148 (Pa.Cmwlth. 1987). Under the participation theory, "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978). Further, an officer may be held liable for misfeasance, but not for simple nonfeasance. Kaites, 529 A.2d at 1151, citing Amabile v. Auto Kleen Car Wash,  376 A.2d 247 (Pa. Super. Ct. 1977).  The difference between the participation theory and piercing the corporate veil has been explained by the

58

Pennsylvania Supreme Court:

> There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 89-90 (1983) (footnote omitted). A corporate officer can be held liable for misfeasance, which is the improper performance of an act, but not for mere nonfeasance, which is the omission of an act which a person ought to do. Wicks, 470 A.2d at 90.

CMU alleges that "Bouriez made promises in his personal capacity, which induced CMU to continue working by promising it would be paid when he did not intend to allow such payment, and these promises directly resulted in harm to CMU." (Doc. #89 at 29(emphasis in original)).

To support this allegation CMU cites Exhibits 11 and 42, however, exhibit 11 was struck, and was an e-mail from Beekhuizen to Bouriez and others and contained no reference to a promise by Bouriez. (Doc. #82). Exhibit 42 is a letter from Bouriez to Susan Burkett of CMU which professes to be written in his 'personal

capacity' and outlines his intention to secure funding for CMU <u>at the completion of the audit</u>, and establishes that an escrow account will be established to pay for any work performed by the request of the auditors. (See Doc. #82, ex. 42). This letter is dated April 11, 2001. (Id.) It reveals that Bouriez was writing the letter in his "personal capacity".  He also stated that he was prepared to negotiate the terms of an escrow agreement. It does not contain a personal promise by Bouriez to pay a past due debt or to secure financing if the audit was not successful.  CMU is not attempting to collect for work performed as a result of an auditor's report.  CMU has not cited evidence that supports its claim that Bouriez made any promises to it.

CMU has not produced any evidence that Bouriez committed misfeasance as a shareholder or agent of GTC. It has produced no evidence that it relied upon a promise made by Bouriez or that Bouriez actively participated in preventing it from receiving payment for work performed.

Accordingly, it is recommended that Plaintiffs' Motion for Summary Judgment be granted as to Count II of Defendant's Amended Counterclaims.


III.   <u>CONCLUSION</u>

For the foregoing reasons, it is recommended that Plaintiffs' Motion for Summary Judgment be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.


                         /s/ Ila Jeanne Sensenich
                        ILA JEANNE SENSENICH
                        U.S. Magistrate Judge

Dated: October 7, 2005

cc:  The Honorable Arthur J. Schwab
     United States District Judge

     David J. Laurent, Esq.
     BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.
     Two Gateway Center
     Pittsburgh, PA 15222

     James A. Vollins, Esq.
     George M. Von Mehren
     SQUIRE, SANDERS & DEMPSEY
     127 Public Square
     4900 Key Tower
     Cleveland, OH 44114-1304

     George E. Yokitis, Esq.
     Mindy Shreve, Esq.
     Walter P. DeForest
     DEFOREST KOSCELNIK YOKITIS & KAPLAN
     Koppers Building, 30th Floor
     436 Seventh Avenue
     Pittsburgh, PA 15219


                              61