IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN BOURIEZ,
MONTANELLE BEHEER B.V.,

     Plaintiffs,                                  02cv2104

                                                         **ELECTRONICALLY FILED**

        v.

CARNEGIE MELLON UNIVERSITY,

     Defendant.

<u>**MEMORANDUM OPINION**</u>

**August 30, 2007**

## I.      Introduction

Pending before this Court are the parties' cross-motions for summary judgment (document nos. 214 and 219).  Plaintiffs, Christian Bouriez ("Bouriez") and Montanelle Beheer B.V. ("Montanelle") (collectively "Plaintiffs"), a company incorporated and owned by Bouriez, seek partial summary judgment in their favor, for their claims for fraud and negligent misrepresentation against defendant Carnegie Mellon University ("CMU" or "CMRI") and for CMU's counterclaim for unjust enrichment against Plaintiffs.[1]  Defendant CMU seeks summary judgment on all counts of the complaint, namely fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment.

After careful consideration, and for the reasons set forth below, Plaintiffs' motion for

---

[1]CMRI is the Carnegie Mellon Research Institute and a division of CMU.  Plaintiffs' claims are based on representations that CMRI made to them while it was conducting research and coordinating the Project in dispute.

partial summary judgment will be denied and CMU's motion for summary judgment on all counts of the complaint will be granted.

## II.    Procedural Background

On October 6, 2002, Plaintiffs filed a complaint against CMU alleging fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), and unjust enrichment (Count III).  Plaintiffs' complaint alleges that CMU misrepresented facts regarding a microwave catalytic cracking technology that CMU claimed to have developed under a contract with Governor's Refining Technologies Corporation, LLC ("GRT").[2]  Plaintiffs claim that the misrepresentation induced them to invest five million dollars ($5,000,000) in GRT's parent company, Governor's Technologies Corporations ("GTC") to fund this microwave catalytic cracking project.

On January 30, 2003, CMU filed a Demand for Arbitration with the International Centre for Dispute Resolution (No. 50T1800006303) against Bouriez, Montanelle, GRT and GTC (collectively "Governors"), and two other individuals, John Cowhig ("Cowhig"), Chief

---

[2]In 1995, CMRI began researching the feasibility of microwave enhanced catalytic cracking (microwave heating).  On May 7, 1996, CMU entered into a written agreement ("the Master Agreement") with Zeta Projects Limited ("ZPL") to pursue the potential of a new technology. Arbitration Opinion,  (Plaintiffs' Brief in Support, Exhibit 2, document no. 220), p. 4.  The exploration of this technology was to be based on previous experiments conducted by CMRI on paraffin wax and Bahrain pitch, a heavy residuum hydrocarbon with the potential of being converted into usable forms of petroleum.  *Id.*  CMRI had purportedly "cracked" the Bahrain pitch using a microwave enhanced catalyst thus producing a diesel range lighter distillate.  *Id.*

The term 'cracking' is basically the breaking-down of long carbon chains of heavy hydrocarbons into smaller molecules that are lighter carbon distillates (essentially purer forms). The same method was applied to paraffin wax.  The hope was to eventually be able to use the microwave cracking method to produce lighter distillates from heavy hydrocarbons.  *Id.*  If successful, this would have provided a better alternative to cracking pitch with other types of thermal heat.

Executive Officer of Governors, and a shareholder in GTC, and David Grayson ("Grayson"),

President of Governors and a shareholder in GTC.  Bouriez, Montanelle, GTC, Grayson, and

Cowhig objected arguing they were not parties to the Arbitration.

On January 31, 2003, CMU filed a motion seeking to compel (document no. 5) Plaintiffs

to arbitrate their claims.  CMU's Motion to Compel was based on the 1996 Master Agreement

between CMU and Zeta Projects Limited (GRT's predecessor) (see note 2, *supra*) which

contained a clause mandating that any dispute over the Master Agreement be settled by

arbitration in Pittsburgh, Pennsylvania.  This Court granted CMU's motion and ruled as follows:

 "Plaintiffs, as agents of Governors Technologies Corporation . . . are bound by their principal's

("GTC's") agreement to arbitrate.  Plaintiffs embraced the [Master] Agreement and directly

benefitted therefrom" and thus were equitably estopped from avoiding its arbitration clause.

Order of Court Regarding Arbitration, Dated February 27, 2003, document no. 22, p. 1.

The United States Court of Appeals for the Third Circuit overturned this Court's Order,

stating as follows:

> Bouriez is complaining that Carnegie Mellon wrongly induced him into a
> shareholder agreement with Governors Technologies.  While the purpose of
> that agreement was that Bouriez could provide money to Governors
> Technologies that Governors Technologies would use to fund Carnegie
> Mellon, the fact remains that Bouriez's claims deal with his shareholder
> agreement, and not the [Master Agreement] . . . .  A dispute that arises under
> one agreement may be litigated notwithstanding a mandatory arbitration clause
> in a second agreement, even when the two agreements are closely intertwined .
> . . .  The District Court's contrary conclusion fails to acknowledge that Bouriez
> was one step removed from the 1996 Agreement and, therefore is not equitably
> estopped from avoiding the arbitration clause contained in that Agreement.

*Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 295 (3d Cir 2004).

On April 21, 2004, CMU filed its Answer with counterclaims and subsequently, an

Amended Counterclaim on November 19, 2004.  The three counterclaims allege that: CMU is a

third party beneficiary of the contract between Bouriez and GTC or, in the alternative, that

Plaintiffs were unjustly enriched (Count I); that Plaintiffs are personally liable as to the contract

between Bouriez and GTC and CMU wishes to pierce the corporate veil or hold Plaintiffs liable

under the participation theory (Count II); and finally that CMU has a claim for ownership of

Bouriez' shares in GTC if he is awarded damages.

During the Arbitration, the Arbitrator dismissed Cowhig and Grayson as parties, leaving

CMU and the Governors as the remaining parties.  CMU sought payment for unpaid invoices for

the research conducted on the microwave catalytic cracking technology project ("Project"), in the

amount of $1,229,127.30 plus interest, (2) a declaration that only CMU had rights, including

intellectual property rights, in the microwave catalytic cracking technology, and (3) a denial of

the Respondents' counterclaim.  Arbitration Opinion, p. 3.  GRT sought an award against CMU

of the money that had been previously paid for the Project and to third parties for equipment,

arbitration costs and expenses, and a denial of CMU's claims.  *Id.*  GTC sought a dismissal from

the Arbitration or in the alternative, if it was deemed to be a proper party, a denial of CMU's

claims. *Id.*

The Arbitrator found that:

> [Due to] the nature of the relationship between the parties, CMRI had a duty of
> full and frank disclosure to GRT [and] . . . it did not satisfy that duty.  It was
> incumbent on CMRI to explain carefully to GRT the very significant
> limitations on drawing conclusions about the benefits of microwaves in
> cracking heavy hydrocarbons from the experiments which had been performed.
> Had it done so, it is unlikely that GRT would have funded, and continue to
> fund, the Project . . . .  Thus GRT, although not satisfying the burden of proof
> to establish fraudulent misrepresentation, has satisfied its burden of proof to
> establish negligent misrepresentation

> CMU breached its agreement with GRT in such a fundamental manner as to constitute a failure of consideration.  GRT is entitled to rescission.  It is therefore entitled to *return of all monies paid to CMU by GRT and GTC in connection with the Project ($5,895,734), and all monies paid to third parties for Project equipment in support of the Project ($982,607)*.  GRT is entitled to interest of 6% simple interest *per annum* on the above amounts.

> All of CMU's claims are denied.  Upon CMU's compliance with this Award, however, neither GRT nor GTC will have any interest in the Funded Technology or Funded Equipment, all of which will be owned by CMU.

Arbitration Opinion, pp. 32, 38-40 (emphasis added).

On December 6, 2004, Plaintiffs filed a Motion to Dismiss Count II of CMU's Amended Counterclaim, arguing that the decision in the arbitration order appeal, *Bouriez*, 359 F.3d 292, was the law of the case and precluded Count II of CMU's counterclaims.  Plaintiffs also argued that CMU failed to state a claim as to Count II.  Plaintiffs' motion to dismiss was denied.  Document no. 104.  Plaintiffs subsequently filed a motion for summary judgment as to Counts I and II of CMU's Amended Counterclaim which was granted by Order of November 9, 2005.  Document no. 118.

On June 21, 2007, CMU filed a summary judgment motion as to all the counts of the complaint.  Plaintiffs filed a motion for partial summary judgment in their favor for Counts I and II of the complaint and against CMU on its counterclaim of unjust enrichment.

### III.    Factual Background

The parties have stipulated to the following facts in their Joint Concise Statement of Material Facts (document no. 93) and Joint Stipulation (document no. 125):

Carnegie Mellon Research Institute ("CMRI" or "CMU") was an unincorporated, non-academic, organizational unit of Defendant CMU.  CMRI was engaged in scientific research

and development for government agencies and industrial entities whom CMRI called "sponsors." On May 7, 1996, Carnegie Mellon entered into a written agreement with Zeta Projects Limited ("ZPL") (the " Master Agreement").  In 1997, CMU entered into a Project Plan for Microwave Enhanced Catalytic Processing ("Project Plan") with ZPL.  On July 17, 1999 ZPL assigned the Master Agreement to Recovery Refining Technologies, LLC ("RRT"), which subsequently changed its name to Governors Refining Technologies, LLC ("GRT").  On September 11, 1997, CMU, ZPL, and GRT entered into a written agreement entitled "Consent and Agreement to Assignment and Assumption" (the "Consent to Agreement") in which CMU consented to the assignment of the Master Agreement from ZPL to GRT.

Plaintiff Bouriez is an investor who resides in London, England and came to Pittsburgh to learn about the research being conducted by CMU under Governors' sponsorship.  Dr. Alberto Guzman ("Guzman") was an Associate Director of CMRI.  Mr. Patrick Brassart ("Brassart") introduced Bouriez to CMRI.  Governors provided Bouriez with a written Business Plan. Bouriez read the Business Plan before investing in Governors.  Governors provided Bouriez with a Project Plan written by CMRI.  Bouriez met with CMRI and Governors representatives on three occasions in 1999.  On October 5, 1999, Bouriez and Montanelle agreed to invest $5 million in Governors in order to fund the work being done by CMRI under Governors' sponsorship.

Plaintiffs and other GTC shareholders signed two documents entitled "Shareholders Agreement" and the "Share Purchase Agreement."  CMU is not a signatory to the Share Purchase Agreement.  Governors owed CMU in excess of $1.2 million for work previously done by CMRI.  Also in October 1999, Bouriez nominated himself and Brassart to serve as directors of GTC.  Bouriez did not retain an independent advisor with microwave or petroleum processing

expertise to evaluate the microwave catalytic cracking technology CMRI claimed to have developed prior to investing in Governors.  Bouriez and Montanelle received stock from Governors in exchange for their $5 million investment and they still own the stock.

In September, 2000, Bouriez and CMRI learned that Governors was out of money and were informed that Cowhig and Grayson had diverted approximately $1.35 million of the original $5 million that had been invested by Bouriez, in order to pay for a debt that was not related to the Project research being conducted by CMRI.  This diversion of the money was done without authority from the Governors Board of Directors.  The remainder of the $5 million was used for the Project.  On December 4, 2000, CMRI stopped working for Governors due to outstanding payments owed by Governors.  On December 19, 2000, Susan Burkett sent Cowhig a letter stating: "Enclosed please find an invoice in the amount of $1,021,135.00 for work done on behalf of Governor's Technologies Corporation by CMRI through October 31, 2000.  Bouriez had a major concern with the dilution of his investment in GTC.

### IV.    Summary Judgment

### A.    Standard of Review

Summary judgment, under Fed. R. Civ. P. 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Woodside v. School Dist. Of Philadelphia Bd. Of Educ.,* 248 F.3d 129, 130 (3d Cir. 2001), quoting *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted).  Deciding on a summary judgment motion requires that the court "view the evidence . . . through the prism of the substantive evidentiary burden" in order to

ascertain "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Where the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' – that is pointing out to the District Court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998), quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

**B.     Substantive Standards**

Under Pennsylvania law, the elements necessary for a fraudulent misrepresentation claim are: (1) a false representation of an existing fact or non-privileged failure to disclose, (2) which is material to the transaction at hand, (3) made with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intention of misleading another into relying on it; (5) justifiable reliance on the misrepresentation and (6) a resulting injury proximately caused by the

reliance.  *Overall v. University of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005);  *Boyd v. Rockwood Area School Dist.*, 907 A.2d 1157, 1170 (2006).

The elements for negligent misrepresentation under Pennsylvania law are: (1) a misrepresentation of a material fact; (2) made under circumstances in which the party ought to have known its falsity; (3) with an intent to induce another to act on it, and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  *Colacicco v. Apotex, Inc.*, 432 F.Supp.2d 514, 554 (E.D.Pa. 2006)

Thus, proximate cause is an essential element of both fraudulent misrepresentation and negligent misrepresentation.  *Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 445-46 (3d Cir. 2000).

The elements of unjust enrichment under Pennsylvania law are: (1) benefits conferred on defendant by plaintiff, (2) appreciation of such benefits by defendant, and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.  *Castle v. Crouse*, 2004 WL 257389, at *8 (E.D.Pa 2004) (citations omitted).

### V.    Discussion

1.    <u>Summary Judgment in Favor of CMU is Appropriate on Counts I and II of the Complaint because Plaintiffs have no damages</u>.

Defendant CMU argues that summary judgment should be granted on Counts I and II (fraudulent and negligent misrepresentation) of the complaint because Plaintiffs cannot prove an essential element of either cause of action, namely, that their economic loss resulted from, i..e, was the proximate cause of, CMU's misrepresentations.  CMU returned to Governors (pursuant

to the Arbitration Award), all the funds Governors had paid CMU for the Project (which included

Plaintiffs' investment), and had also compensated Governors for all the amounts paid to third

parties in connection with the Project.  Thus, Plaintiffs have no damages that were proximately

caused by CMU.  Plaintiffs disagree with CMU claiming that CMU's payment of the Final

Award, in no way, releases CMU from liability to Plaintiffs.

Furthermore, CMU asserts its misrepresentation cannot be the cause of any remaining

loss that Plaintiffs have suffered.  "Rather, any such alleged shortfall [of funds] would be the

result of circumstances other than alleged misrepresentations or other conduct of [CMU],

including decisions made by officers of Governors regarding how invested funds would be used."

Defendant's Brief in Support (document no. 215), pp. 5-6.  Plaintiffs, as shareholders in

Governors,  must seek reimbursement from Governors as it is now in possession of the funds

(damages) CMU has returned.

Plaintiffs argue they have a direct cause of action against CMU as their claims are based

on misrepresentations CMU *made to them directly*.  Plaintiffs assert that, "[a]lthough the

misrepresentations [made to them] were the same ones as made to Governors [and decided upon

during the Arbitration]. . . [their] claims are not derivative of their rights as shareholders of GTC.

Because CMU is the actual and legal cause of Plainitffs' injuries, Plaintiffs are entitled to a direct

recovery from CMU."  Plaintiffs' Brief in Opposition (document no. 223), pp. 2-3.  To that end,

Plaintiffs cite to two cases they argue establish that they have a direct cause of action against

CMU, namely, *Davis v. U.S. Gympsum Co.*, 451 F.2d 659 (3d Cir. 1971) (minority stockholder

in a bankrupt corporation brought action against defendant corporation alleging a conspiracy to

defraud him by transferring a distributorship from the bankrupt corporation; the Court of Appeals

found that most of plaintiff's claims were based upon an alleged fraud perpetrated upon him personally and not on his bankrupt corporation by defendant corporation) and *Vierling v. Baxter*, 293 Pa. 52, 141 A. 728 (1928) (plaintiff, inventor and patentee, filed an action against defendants (members of a corporation) alleging that defendants conspired to cheat and defraud him and in furtherance of that fraudulent conspiracy, they induced him to enter into an agreement; the Court ruled that since the wrongs plaintiff alleges were committed against him personally, plaintiff's individual action could be maintained).   Plaintiffs rely on these cases for the proposition that a shareholder can bring a direct action against a wrongdoer in two situations: the first being when the individual has been personally wronged and the second being when a special relationship exists between the parties.  Plaintiffs' Brief in Opposition, pp. 3-4.

Assuming Plaintiffs are correct that Governors' recovery on its claims do not necessarily preclude them from bringing an action in their own right as individual investors misled into making an investment, they have failed to offer any *evidence* to support an essential element of their claims.  As set forth above, proximate cause is an essential element of both fraudulent misrepresentation and negligent misrepresentation.  *Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d at 445-46. "It is beyond question that the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation." *Cuthbert v. City of Philadelphia,* 417 Pa. 610, 209 A.2d 261 (1965);  *Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281, 1286 (Pa.Super. 2005).  As the Pennsylvania Supreme Court has stated, "even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct, and it must be shown to have been the proximate cause

of plaintiff's injury." *Hamil v. Bashline*, 481 Pa. 256, 264, 392 A.2d 1280, 1284 (1978); *Lux*, 887 A.2d at 1286, quoting *Taylor v. Jackson*, 164 Pa.Cmwlth. 482, 643 A.2d 771, 775 (1994). The burden of proving proximate cause is upon the plaintiff and must be sustained by a preponderance of the evidence. *Little v. York County Earned Income Tax Bureau*, 333 Pa.Super. 8, 481 A.2d 1194, 1198 (Pa.Super.1984).

As a matter of law, the court is required to make the threshold determination of whether a defendant's conduct, or alleged breach of duty, could constitute the proximate, or legal, cause of a plaintiff's injury. *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 868 (Pa.Super. 2000). In *Brown*, the Pennsylvania Superior Court explained that proximate cause "is primarily a problem of law" and that it is the court's responsibility to evaluate the alleged facts and refuse to find an actor's conduct the legal cause of harm "when it appears to the court highly extraordinary that [the actor's conduct] should have brought about the harm.' " 760 A.2d at 868, quoting *Bell v. Irace*, 422 Pa.Super. 298, 301-03, 619 A.2d 365, 367 (1993). Thus, proximate cause must "be determined by the judge and it must be established before the question of actual cause is put to the jury." *Brown*, 760 A.2d at 868, quoting *Reilly v. Tiergarten, Inc.*, 430 Pa.Super. 10, 633 A.2d 208, 210 (1993).

Legal or proximate causation involves a determination that the nexus between the wrongful acts or omissions and the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable. *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21 (1996), citing *E.J. Stewart, Inc. v. Aitken Products, Inc.*, 607 F.Supp. 883, 889 (E.D.Pa. 1985). "Proximate cause is a term of art denoting the point at which legal responsibility attaches for the harm to another arising out of some act of defendant." *Little*, 481

A.2d at 1198.   See also *Hector v. Watt*, 235 F.3d 154, 162-63 (3d Cir. 2000) (Nygaard, J.,

concurring:  "The issue of proximate cause . . . requires closer analysis [than cause- in- fact

analysis].  Unlike causation in fact, proximate causation is a legal construct fashioned according

to policy considerations.  As Justice Andrews stated in his classic dissent in *Palsgraf v. Long*

*Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 103 (1928), '[w]hat we mean by the word 'proximate' is

that, because of . . . public policy . . . the law arbitrarily declines to trace a series of events

beyond a certain point.'"

In *Wilder v. United States*, 230 F.Supp.2d 648, 654 (E.D.Pa. 2002), the United States

District Court for the Eastern District of Pennsylvania summarized the general principles of

proximate causation in Pennsylvania tort law as follows:

> To satisfy the requirement of causation, the complainant must demonstrate that
> the breach was both the proximate and the actual cause of the injury.  *Reilly v.*
> *Tiergarten, Inc.*, 430 Pa.Super. 10, 633 A.2d 208, 210 (1993). While actual and
> proximate causation are often confused, a finding of proximate cause turns
> upon "whether the policy of the law will extend the responsibility for the
> negligent conduct to the consequences which have in fact occurred.  The term
> 'proximate cause' is applied by the courts to those more or less undefined
> considerations which limit liability even where the fact of causation is clearly
> established.  *Brown*, supra, quoting *Bell v. Irace*, 422 Pa.Super. 298, 619 A.2d
> 365, 367 (1993).
>
> Proximate cause is primarily a problem of law and it is the court's
> responsibility to evaluate the alleged facts and refuse to find an actor's conduct
> the legal cause of harm when it appears to the court highly extraordinary that
> the actor's conduct could have brought about the harm.  Thus, proximate cause
> must be determined by the judge and it must be established before the question
> of actual cause is put to the jury.  *Id.*, citing *Reilly*, 633 A.2d at 210.  Stated
> otherwise, Pennsylvania law will not support a finding of proximate cause if
> the negligence, if any, was so remote that as a matter of law, the defendant
> cannot be held legally responsible for the harm which subsequently occurred.
> *Brown*, 760 A.2d at 869.  The test for proximate causation is whether the
> defendant's acts or omissions were a "substantial factor" in bringing about the
> plaintiff's harm.  *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21

(1996).

Section 433 of the Restatement of Torts, Second (1965) sets forth a method of determining whether negligent conduct is a substantial factor in producing injury.  It provides:

> § 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm
>
> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

*Vattimo v. Lower Bucks Hospital*, 502 Pa. 241, 465 A.2d 1231 (1983).

The concepts of intervening and superseding cause are subspecies of the proximate cause analysis.  See *Feeney v. Disston Manor Personal Care Home, Inc.*, 849 A.2d 590, 594-95 (Pa. Super. 2004) ("The causal connection referred to as proximate cause can be established by evidence that the defendant's negligent act or failure to act was a substantial factor in bringing about the plaintiff's harm. . . . .   Two or more causes may contribute to and thus be the legal or proximate cause of an injury.  *Powell v. Drumheller*, 539 Pa. 484, 653 A.2d 619, 623 (1995). To determine if an intervening force is a superseding cause, 'the test is whether the intervening conduct was so extraordinary as not to have been reasonably foreseeable.'"); *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1060 (Pa. Super. 2003) ("Appellant's failure to abide by the

provisions of [the statute] was not the proximate cause of [plaintiff's] injuries.  It is well settled that a tortfeasor . . . may be relieved of his responsibility for his negligent conduct from an intervening act of a third party, if that intervening act constitutes a 'superseding cause.'  *Frey v. Smith*, 454 Pa.Super. 242, 685 A.2d 169, 173 (1996).  A 'superseding cause' is an act of a third person or other force which, by its intervention, prevents the negligent party from being liable for harm to another caused by his or her antecedent negligent conduct" (additional citations omitted);

As the Pennsylvania Superior Court recently explained:

> Legal causation is found when a defendant's negligent conduct is a "substantial factor" in bringing about the specific harm incurred. . . .  Whether a defendant's conduct has been a "substantial factor" in causing plaintiff's harm is ordinarily a question of fact for the jury. . . .  The matter may be removed from the jury's consideration only when it is clear that reasonable minds cannot differ on the issue. . . .

> *   *   *

> An "intervening force" is defined as "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Restatement (Second) of Torts § 441 (1965). A "superceding cause" is defined as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440 (1965).

> Among the factors to consider in determining whether a subsequent force is an intervening or superceding cause are whether the force is operating independently of any situation created by the first actor's negligence and whether it is a normal result of that situation. . . .  "Even where an intervening act is wrongful it does not become a superceding cause unless, looking retrospectively from the harm through the sequence of events by which it was produced, it is so extraordinary as not to have been reasonably foreseeable." Id. at 632 (quoting *Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 253, 465 A.2d 1231, 1237 (1983));  See also Restatement (Second) of Torts § 435, Foreseeability of Harm or Manner of its Occurrence.

*Rabutino v. Freedom State Realty Co., Inc.*, 809 A.2d 933, 941-42 (Pa. Super. 2002) (certain

citations omitted);  See also *Brown*, 760 A.2d 863 ("it is abundantly clear that factors other than

the negligence of [defendant] had a far greater effect in producing the harm complained of," and

collecting numerous cases wherein intervening, superseding causes rendered the defendant's

misconduct too remote from the harm arising to the plaintiff to be considered a substantial factor

in proximately causing plaintiff's harm).

"Causation in the securities context is strikingly similar to the familiar standard in the

torts context, but with different labels. In the securities realm, 'but for' causation is referred to as

'reliance, or transaction causation,' and 'proximate cause' is known as 'loss causation.'"

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).  In *McCabe v. Ernst &

Young, LLP,* ___ F.3d ___, 2007 WL 2301916 (3d Cir. 2007), the Court of Appeals for the Third

Circuit recently explained that "loss causation" analysis in the securities fraud, section 10(b)

(Rule 10b-5) context is the functional equivalent to "proximate cause" analysis of tort law, and

held that the section 10(b) plaintiff cannot satisfy the loss causation requirement simply by

showing that a material misrepresentation or omission had induced him to buy or sell securities

at a less-favorable price, and that summary judgment was appropriate because plaintiff had failed

to show there was a genuine issue of material fact on the loss causation element, given plaintiff's

failure to produce evidence that registration defaults and threats of litigation arising from

misrepresentations had caused the stock price decline.

As with any negligence or tort cause of action, the plaintiff making a section 10(b)

securities fraud claim must bear the burden of proving the "common law loss causation element

[which] is codified as a requirement in the Private Securities Litigation Reform Act ("PSLRA"):

'the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused

the loss for which the plaintiff seeks to recover damages.' 15 U.S.C. § 78u-4(b)(4) (2006).  See

also *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 208 n. 15 (3d Cir. 2006)." *McCabe*,

2007 WL 2301916 at *5.[3]  The Court of Appeals' discussion of loss causation in the section 10b-

5 context is very instructive on the proximate cause issue in this case, and in pertinent part, is as

follows:

> "Similar to the concept of proximate cause in the tort context, loss causation
> focuses on whether the defendant should be held responsible as a matter of
> public policy for the losses suffered by the plaintiff." *Berckeley*, 455 F.3d at
> 222. A § 10(b) plaintiff must show both that (1) the plaintiff entered the
> transaction at issue in reliance on the claimed misrepresentation or omission
> (transaction causation) and (2) the defendant misrepresented or omitted the
> very facts that were a substantial factor in causing the plaintiff's economic loss
> (loss causation).
>
> *   *   *
>
> It is more difficult to categorize the required loss causation showing in
> non-typical § 10(b) actions such as this one than it is in typical § 10(b) actions.
> In a typical "fraud-on- the- market" § 10(b) action, the plaintiff shareholder
> alleges that a fraudulent misrepresentation or omission has artificially inflated
> the price of a publicly- traded security, with the plaintiff investing in reliance
> on the misrepresentation or omission; to satisfy the loss causation requirement,
> the plaintiff must show that the revelation of that misrepresentation or
> omission was a substantial factor in causing a decline in the security's price,
> thus creating an actual economic loss for the plaintiff. *Semerenko v. Cendant
> Corp.*, 223 F.3d 165, 184-85 (3d Cir. 2000). See also *EP MedSystems*, 235
> F.3d at 884 (collecting typical § 10(b) cases).
>
> But in a non-typical § 10(b) action, where the plaintiff does not simply
> allege that the price of a publicly-traded security has been affected, the factual
> predicates of loss causation fall into less of a rigid pattern.

------

[3] Plaintiff also bears the burden of proving reliance, which is often referred to in cases
involving public securities markets as "transaction causation," which the Court of Appeals
explains is the functional equivalent of "but for" or "cause in fact" analysis, "i.e., that but for the
fraudulent misrepresentation or omission, the investor would not have purchased or sold the
security." *McCabe*, 2007 WL 2301916 at *5.

\*   \*   \*

The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss. See *Semerenko*, 223 F.3d at 185, 187 (stating "an investor must . . . establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation" and clarifying the loss causation requirement would not be met where "the misrepresentations were not a substantial factor"). In *EP MedSystems*, we characterized *Semerenko*'s as "a practical approach, in effect applying general causation principles." 235 F.3d at 884.

\*   \*   \*

In *Berckeley*, 455 F.3d at 223, another non-typical § 10(b) case, we held the loss causation requirement had not been satisfied because plaintiff had failed to establish a "direct causal nexus between the misrepresentation and the plaintiff's economic loss." . . .

\*   \*   \*

The Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss:

> The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The [loss] causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). See also *Berckeley*, 455 F.3d at 222 ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.' ") (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)). This approach has been advocated by some scholars, as well:

> [I]f false statements are made in connection with the sale of

> corporate stock, losses due to a subsequent decline in the market,
> or insolvency of the corporation brought about by business
> conditions or other factors in no way relate[d] to the
> representations will not afford any basis for recovery. It was only
> where the fact misstated was of a nature calculated to bring about
> such a result that damages for it can be recovered.

> W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 110 (5th
> ed.1984). See also Dane A. Holbrook, Measuring and Limiting Recovery
> Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities
> Fraud Litigation, 39 Tex. J. Bus. L. 215, 260-62 (2003) ("The materialization
> of risk approach requires plaintiffs to prove that the materialization of an
> undisclosed risk caused the alleged loss. . . . [C]ourts utilizing this approach
> will not compensate a plaintiff who assumes the risk of an intervening factor. .
> . . [This] approach most appropriately balances the interests of plaintiffs and
> defendants.").

>    We believe this approach is consistent with our loss causation
> jurisprudence in *Berckeley, Newton*, and *EP Medsystems*. Therefore, to make
> the requisite loss causation showing, the ATS Plaintiffs must show that
> Vertex's prior registration defaults and consequent litigation risks (the very
> facts Ernst & Young allegedly omitted) were a substantial factor in causing the
> ATS Plaintiffs' economic loss.

*McCabe*, 2007 WL 2301916 at *5-*9 (footnotes omitted).

Applying the above proximate cause/ loss causation analysis to the undisputed facts of

this case, the Court finds that whatever economic loss Plaintiffs continue to suffer, i.e., whatever

the diminution of their $5 million stock investment in Governors continues to be after CMU has

already returned *all of the monies* it received from Governors for use in the Project, is not the

proximate cause of CMU's misrepresentations, but of other forces.  In their Memorandum of

Law (doc. no. 220) in support of their motion for summary judgment, Plaintiffs spend less than

one page discussing one of the essential elements of their claims for negligent and fraudulent

misrepresentation, namely, that the misrepresentations proximately caused  injury or damages to

Plaintiffs, and this only to rebut CMU's reliance on the Economic Loss Doctrine.  Plaintiffs' 30-

page Memorandum spends 29 pages explaining why the Arbitration Decision is binding on CMU, rehashing CMU's misrepresentations as found by the Arbitrator, and explaining why, because those misrepresentations were the "same negligent misrepresentations made to ***both*** governors and Plaintiffs," Memorandum in Support of Summary Judgment at 2 (emphasis in original), Plaintiffs are "entitled to monetary damages." The only mention of damages in Plaintiffs' Memorandum in Support of Summary Judgment is the argument that "Plaintiffs are entitled to damages from CMU [because] . . . the Economic Loss Doctrine is simply inapplicable in this case, and Plaintiffs are entitled to recover damages for their loss." Plaintiffs' Memorandum in Support of Summary Judgment at 23.

What Plaintiffs fail to acknowledge is that those "very same misrepresentations" caused the "very same damages" to both Governors and Plaintiffs, and those damages, as measured by the Arbitrator, are the *full amount of monies* Governors had invested with CMU pursuant to the rescinded agreement, which monies CMU has already paid back in full, with interest. Thus, CMU has disgorged to Governors *all monies invested by Plaintiffs* that were passed through Governors to CMU for use on the Project.

Plaintiffs implies that those "very same misrepresentations" made to Plaintiffs by CMU have caused some independent injuries or damage to them, but they do not even attempt to demonstrate any actual independent damages by references to any record evidence. Rather, Plaintiffs simply assert, as a matter of law, that the entire $5 million they invested with Governors to, in turn, fund the CMU Project is the measure of their reliance damages, as if Plaintiffs' damages were somehow distinct from Governors' damages.

Nor does Plaintiffs' Brief in Opposition to CMU's Motion for Summary Judgment (doc.

no. 223) offer any concrete evidence that they sustained some independent damages beyond that which CMU has already been ordered to, and did, remedy.  Plaintiffs' response brief to CMU's motion for summary judgment summarizes their position as follows: "Plaintiffs relied upon [CMU's] misrepresentations and, as a result, lost $5 million."  As set forth above, Plaintiffs may have "lost $5 million" but not "as a result" of CMU's misrepresentations; what was lost "as a result" of CMU's representations was all of the monies CMU was ordered to return to Governors when its agreement with CMU was rescinded, which *included* all of Plaintiffs' investment that was channeled through Governors for the Project.  CMU proximately caused *exactly* all of the economic loss represented by the monies it returned to Governors.  To the extent Plaintiffs' investment in Governors is no longer worth $5 million, Plaintiffs have not offered any record evidence to show that the entirety of any lost value is attributable to CMU's misrepresentations, rather than the $1.35 million diversion of funds by Governors' directors and other forces.

Plaintiffs made no direct investments with CMU, they only channeled their investment through Governors.  CMU has already disgorged more than the full measure of the monies funded by Governors in reliance on CMU's negligent misrepresentations, and did not reap any additional benefits from Plaintiffs $5 million investment with Governors, some of which flowed through Governors to CMU.  Whatever investments were made or funds used in the Project as a result of CMU's negligent misrepresentations were returned to the source of the funds, Governors.  In other words, CMU's material, negligent misrepresentations caused ***both*** Plaintiffs and Governors to invest $5 million [or some portion thereof] in the CMU Project, not $5 million from Plaintiffs and $5 million more from Governors.  It is not a double *recovery* that Plaintiffs seek, but a double *payment* from CMU for the "very same harm" caused by the "very same

misrepresentations" made to both Governors and Plaintiffs.

Plaintiffs have no separate injuries or damages "as a result" of CMU's misrepresentations. See *DeBartolo v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D.Pa. 1996) (proving a cause of action for fraud requires the plaintiff to show damage as a proximate result of the misrepresentation)  Therefore, Plaintiffs have failed to establish that there is a genuine issue of fact regarding their claims of fraudulent and negligent misrepresentation.

      2.    <u>Summary Judgment in favor of CMU is Appropriate on Count III of the Complaint because Carnegie Mellon no Longer Retains any Alleged Benefit</u>.

CMU argues that since it has complied with the Arbitration Award on November 3, 2006, it no longer retains any benefits from Plaintiffs' investment.  The repayment negates Plaintiffs' argument that CMU continues to benefit from unjust enrichment.  Plaintiffs do not contest CMU's argument, but instead have declined to pursue their claim for unjust enrichment in light of the Arbitration's ruling that Governors were entitled to rescission, that CMU was to return all the monies paid by Governors for the Project and that all the technology and equipment utilized in the Project belongs to CMU.  Therefore, this Court will grant Defendant's motion for summary judgment on Count III of the complaint.

      3.    <u>Punitive Damages</u>.

Plaintiffs also argue that punitive damages are appropriate due to the "Arbitrator's factual conclusions clearly establishing Plaintiffs' entitlement to punitive damages."  Plaintiffs' Brief in Support, p. 29.  The Arbitrator did not find CMU liable for fraudulent misrepresentation as Governors did not meet the higher standard of proof (which must be 'clear, precise, and convincing') for fraud; rather CMU was found liable for negligent misrepresentation.

Even assuming that a claim for punitive damages could survive a finding that there were no compensatory damages for which CMU was responsible, Plaintiffs have offered no evidence to show that CMU's culpability rises to the level necessary to sustain an award of punitive damages. "When fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more." *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 442 (1992). "Pennsylvania law permits the recovery of punitive damages for 'torts that are committed willfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured.' " *Golden ex rel. Golden v. Golden*, 382 F.3d 348, 356 (3d Cir. 2004) (citations omitted). Restatement (Second) of Torts § 908(2). See also *Meyers v. Sudfeld*, 2007 WL419182 *12, (E.D.Pa. 2007) ("In Pennsylvania, a court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive.") Plaintiffs fail to cite to any record evidence establishing such behavior.

## IV.   Conclusion

Plaintiffs devote much of their argument to discussion of offensive collateral estoppel due to the ruling of the Arbitration Opinion and how that should be applied against CMU in this proceeding to preclude them from litigating issues finally resolved against CMU therein. This opinion has assumed Plaintiffs are correct, and has taken CMU's misrepresentations and the Arbitrator's decision as the starting point, but nevertheless, Plaintiffs failed to show that CMU's misrepresentations proximately caused injury or damages to Plaintiffs and the Arbitrator's decision obviously did not resolve that issue one way or the other.

As summary judgment has been granted on all counts of the complaint, CMU's counterclaim of Plaintiffs' benefitting from unjust enrichment is rendered moot.

For the foregoing reasons,  Plaintiffs' motion for partial summary judgment (document no. 214) will be denied and Defendant's motion for summary judgment (document no. 219) on all counts of the complaint will be granted.

An appropriate order will follow.


<u>/s/ Arthur J. Schwab</u>
**Arthur J. Schwab**
**United States District Judge**


cc:      All counsel of record listed on ECF